COUNTRYMARK COOPERATIVE, INC., Appellee,

v.

SMITH, Appellant.

[Cite as *Countrymark Cooperative, Inc. v. Smith* (1997), 124 Ohio App.3d 159.]

Court of Appeals of Ohio,
Third District, Hancock County.

No. 5–97–21.

Decided Dec. 8, 1997.

160

*Thompson, Hine & Flory, L.P.A.,* and *Jack F. Fuchs,* for appellee.

*Tompkins & Denkewalter Co., L.P.A.,* and *Ronald C. Tompkins,* for appellant.

THOMAS F. BRYANT, Judge.

Defendant–appellant, Biron J. Smith, appeals from the judgment entered by the Common Pleas Court of Hancock County granting Countrymark Cooperative, Inc.'s motion for summary judgment pursuant to Civ. R. 56(C).

Countrymark alleged that Smith had failed to perform, and to give adequate assurances of performance, on eleven grain contracts entered into between Smith and Countrymark in December 1994 and May and June 1995. Smith, a farmer and producer of grain, signed eleven contracts with Countrymark, which required Smith to deliver to Countrymark a total of seventy-five thousand bushels of No. 2

yellow corn. The corn was due in multiple shipments over designated delivery periods, with thirty-five thousand bushels due after the fall harvest in 1995 and forty thousand bushels due after the 1996 harvest. It is undisputed that Smith delivered no corn, and offered no adequate assurances of delivery, to Countrymark.

After deposing Smith, Countrymark moved for summary judgment pursuant to Civ. R. 56(C). The trial court granted Countrymark's motion for summary judgment, finding that Countrymark was entitled to judgment as a matter of law upon its complaint and Smith's counterclaims. The trial court also issued a final judgment entry in favor of Countrymark in the amount of $112,000, based on the parties' stipulated damages, pending appeal. Smith now takes this appeal.

Smith has failed to present assignments of error as required by App. R. 16(A)(3). Rather, Smith merely sets forth "issues presented." An appellate court must determine an appeal based on the "assignments of error set forth in the briefs." App. R. 12(A)(1)(b). Nevertheless, for the sake of judicial economy, we construe the issues presented by Smith as raising the following assignments of error:

Relating to Countrymark's complaint:

I. The trial court erred when granting summary judgment in favor of Countrymark because a genuine issue of material fact existed as to whether Smith could prove the affirmative defense of illegality of contract.

Relating to Smith's counterclaim:

II. The trial court erred when granting summary judgment in favor of Countrymark because a genuine issue of material fact existed as to whether Countrymark breached eleven HTA grain contracts.

III. The trial court erred when granting summary judgment in favor of Countrymark because a genuine issue of material fact existed as to whether Smith was fraudulently induced to enter into eleven HTA grain contracts.

IV. The trial court erred when granting summary judgment in favor of Countrymark because a genuine issue of material fact existed as to whether Countrymark violated three federal acts: the Commodity Exchange Act, the Capper–Volstead Act, and the Clayton Antitrust Act.

## I

Smith claims that the trial court erred in finding no genuine issue of material fact as to whether he could prove his affirmative defense of illegality of contract.

Pursuant to Ohio Civ. R. 56(C), the moving party is entitled to summary judgment as a matter of law "when the movant establishes the following: 1) that

there is no genuine issue as to any material fact; 2) that reasonable minds can come to but one conclusion and, viewing the evidence most strongly in favor of the nonmoving party, that conclusion is adverse to the nonmoving party." *Carpenter v. United Ohio Ins. Co.* (May 9, 1997), Crawford App. No. 3–96–16, unreported, at 6, 1997 WL 232727, at *2, citing *Bostic v. Connor* (1988), 37 Ohio St.3d 144, 524 N.E.2d 881.

When reviewing a ruling on a motion for summary judgment, an appellate court undertakes an independent review. *Midwest Specialties, Inc. v. Firestone Tire & Rubber Co.* (1988), 42 Ohio App.3d 6, 536 N.E.2d 411.

A defense alleging illegality of contract is an affirmative defense. *McCabe/Marra Co. v. Dover* (1995), 100 Ohio App.3d 139, 652 N.E.2d 236; *Arthur Young & Co. v. Kelly* (1993), 88 Ohio App.3d 343, 623 N.E.2d 1303. When challenging a contract's enforceability based on illegality, one does not challenge the terms to the agreement; "[i]n short, asserting that defense does not contest the existence of an offer, acceptance, consideration, and/or a material breach of the terms of the contract." *McCabe/Marra Co.*, 100 Ohio App.3d at 148, 652 N.E.2d at 241.

Smith admitted at his deposition that though he signed and voluntarily entered into eleven grain contracts, he failed to deliver and failed to offer adequate assurances of delivery of corn to Countrymark pursuant to those agreements. Accordingly, no genuine issue of material fact exists as to whether Smith breached the contracts as written. R.C. 1302.85 and 1302.67. Smith's liability, therefore, depends on whether his affirmative defense creates a genuine issue of material fact. Accordingly, the issue is whether there is any evidence in the record, when viewed most strongly in favor of Smith, which indicates that a triable issue exists as to whether the eleven grain contracts entered into by Smith and Countrymark were illegal and unenforceable under Ohio law.

Where the performance of a contract violates a statute or act, public policy may prevent the enforcement of its obligations. *Diversified Property Corp. v. Winters Natl. Bank & Trust Co.* (1967), 13 Ohio App.2d 190, 42 O.O.2d 307, 234 N.E.2d 608. Smith and Countrymark agree that grain contracts of the type they had entered into have been termed "hedge–to–arrive" ("HTA") contracts. Smith contends that the HTA contracts he signed enabled him, as the grain seller, to indefinitely roll, or extend, the date of delivery of corn to Countrymark, the purchaser. Indefinitely extending the date of delivery, Smith maintains, makes these eleven contracts illegal under the Commodity Exchange Act ("CEA"), Section 1 *et seq.* Title 7, U.S.Code and unenforceable under Ohio law.

## Hedge–to–Arrive Contracts

In a basic HTA contract, farmers promise to deliver grain at a specific date in the future and purchasers promise to pay an agreed futures price set by reference to the Chicago Board of Trade ("CBOT"), plus or minus a basis, which accounts for local fluctuation in price. *Eby v. Producers Co-op.* (W.D.Mich.1997), 959 F.Supp. 428, 430, fn. 1. The basis can float until fixed by the farmer at any time prior to delivery. *Id.* If basis is not fixed prior to delivery, it will automatically be set by the terms of the contract. *Id.*

Because the market price of grain at the time of delivery may be less than the agreed price, purchasers hedge their position on the contracts with suppliers by taking a short position on the CBOT. *Id.* A short position is an equal and opposite position to that taken in the original grain contract. Short positions are taken by purchasing a put on the CBOT, "[a]n option permitting its holder to sell a certain stock or commodity at a fixed price for a stated quantity and within a stated period." Black's Law Dictionary (6 Ed.1990). Once the put is purchased, the grain purchaser is hedged against a market downturn occurring at the time of delivery.

HTA contracts may benefit farmers by permitting them to lock in a favorable price of grain well before harvest, avoiding the normal market downturn at harvest time. *Eby,* 959 F.Supp. 428. The risk, however, is that grain prices could rise, as they did in the fall of 1995, and a farmer could be forced to comply with the agreed price, well below current market value. *Id.* A variation to the basic HTA contract, called a flex-HTA, provides more flexibility to a farmer, but with more risk. *Id.*

Flex–HTAs permit farmers to roll, or extend, their delivery obligation to a future date, potentially indefinitely at their sole discretion. *Id.* Thus, when the market rises, a farmer under a flex-HTA may elect to extend the original delivery period and sell the current harvest to another buyer at a more favorable market price. The farmer then waits for the market to return a lower position before fulfilling the original obligation. When a farmer decides to extend delivery, the purchaser rehedges on the CBOT and passes the cost on to the farmer in the form of a fee.

■ Flex–HTA contracts that permit the seller to indefinitely extend the date of delivery may lend themselves to speculation and force the seller to settle up with the buyer without ever actually delivering grain. The concern is that instead of actually contracting for the sale and delivery of a commodity, farmers and grain elevators are engaging in speculative off-exchange margin transactions, without oversight by a board of exchange. Accordingly, where a contract is entered into with no intention of delivering the commodity at issue, but instead

with the promise to pay the difference on margin, the Commodity Exchange Act is implicated. *Eby,* 959 F.Supp. 428. In *Eby,* the court found that a triable issue existed as to whether flex-HTA contracts permitting unlimited rolling of the delivery date are illegal off-exchange transactions in violation the CEA.

### Commodity Exchange Act

The CEA prohibits "any person to offer to enter into, to enter into * * * any transaction in, or in connection with, a contract for the purchase or sale of a commodity for future delivery * * * unless (1) such transaction is conducted on or subject to the rules of a board of trade which has been designated by the Commission as a 'contract market' for such commodity." Section 6(a)(1), Title 7, U.S.Code.

An additional limitation to the acts's application is how "future delivery" is defined. "The term 'future delivery' does not include any sale of any cash commodity for deferred shipment or delivery." Section 1a(11), Title 7, U.S.Code.

This definition of future delivery continues the original exemption as set forth in the Futures Trading Act of 1921 and the Grain Futures Act of 1922. *Commodity Futures Trading Comm. v. Co Petro Marketing Group, Inc.* (C.A.9, 1982), 680 F.2d 573. Though the motivation for this legislation was to curb "excessive speculation and price manipulations occurring on the grain futures markets," the definition of future delivery was limited "to meet a particular need such as that of a farmer to sell part of next season's harvest at a set price to a grain elevator or miller." *Id.,* 680 F.2d at 577.

*Co Petro* interprets a "cash commodity for deferred shipment or delivery" as excluding "cash-forward" contracts and not futures contracts. *Id.* at 577–578. The latter contract is viewed as a transaction in a commodity for future delivery forbidden by the CEA unless entered into on a board of trade. *Id.* A cash-forward contract, on the other hand, meets the act's exception as a "cash commodity for deferred shipment or delivery" and may be entered into outside a board of trade. *Id.* Critical to whether a transaction is a cash-forward contract or the more speculative futures contract is whether "both parties to the contracts deal in and contemplate future delivery of the actual grain." *Id.* at 578; see, also, *Salomon Forex, Inc. v. Tauber* (C.A.4, 1993), 8 F.3d 966, 971 (cash-forward contracts "are usually entered into between parties able to make and receive physical delivery of the subject goods"); and *In re Bybee* (C.A.9, 1991), 945 F.2d 309, 314 ("the parties to forward contracts 'have the capacity to make or take delivery' and that delivery generally occurs").

It should be noted that the facts in *Co Petro* did not permit that court to address specifically whether a grain contract for future delivery was an off-exchange transaction in violation of the CEA. Rather, the decision held that fuel

oil marketing contracts for future delivery violated the CEA when both parties were not in the fuel oil business and never actually anticipated delivery of the commodity.

A recent federal district court addressed CEA restrictions on grain contracts for future delivery and held that "the forward contract exclusion, 7 U.S.C. § 1a(11), is available for cash contracts for the sale of grain that are made between persons engaged in the grain business and that are predicated on the expectation of actual, albeit deferred, delivery." *In re Grain Land Coop Cases,* 1997 U.S. Dist. 14712 (Sept. 25, 1997, Third Div. Minn.), No. 3–96–1209, at 13, reinstated on other grounds (Oct. 1, 1997), 978 F.Supp. 1267.

## Smith and Countrymark's Contracts

■ Here, Smith argues that a triable issue of material fact exists as to whether the contracts are illegal off-exchange transactions. Smith claims that evidence in the record if believed indicates that the contracts are for the purchase or sale of a commodity, corn, which is to be delivered in the future, thus implicating the CEA. While it is true that the transactions at issue implicate provisions of the CEA, their enforceability under Ohio law is not prevented by this federal Act.

■ Smith primarily contends that the agreements between himself and Countrymark enabled him to indefinitely roll or extend the date of delivery of grain. This contractual right, Smith maintains, makes the contracts illegal off-exchange transactions in commodities futures. However, as noted above, the mere right to extend delivery is not what causes a contract to violate the CEA. Rather, the CEA prohibits off-exchange transactions for the delivery of commodities in the future when the parties never actually intend to deliver the commodity or have no capacity to do so. *Co Petro,* 680 F.2d 573; see, also, *In re Bybee,* 945 F.2d at 313.

Countrymark attached the eleven grain contracts to its complaint and introduced them as deposition exhibits. Upon review of the contracts we find no language permitting Smith, the seller, to extend the delivery dates at his discretion. The only mention of extending the delivery date reserves that right exclusively for Countrymark, the purchaser, not Smith. All eleven contracts state:

"6. Seller agrees that Purchaser may extend the due date delivery of the grain and/or soybeans beyond the aforementioned date at Purchaser's sole option on written notification of such extension to Seller mailed to Seller's address as shown on this contract."

Further, no language in the contracts indicates that the parties never intended to actually deliver corn. The agreements all contain the following:

"4. Seller and Purchaser agree that this is a contract for delivery of Seller's grain and/or soybeans and is not a futures contract which can be purchased back by Seller's failure or inability to deliver said grain and/or soybeans in no way relieves him of his obligation of delivery of said grain and/or soybeans [*sic*] * * *."

Finally, all eleven contracts contain the following integration clause:

"15. This agreement constitutes the entire understanding of the parties, and may be modified only by a signed writing of both parties, excepting Purchaser's right to extend this contract, and is binding on their heirs, assigns and successors of the parties."

Smith admits that he signed all eleven contracts. Smith further testified that he understood that the contracts required him to actually deliver corn to Countrymark. Furthermore, Smith actually delivered over nine thousand bushels of corn in the fall of 1995 to a different grain purchaser at a more favorable price. Countrymark satisfied its initial burden of presenting evidence that, when viewed most favorably to Smith, demonstrates that the parties actually contemplated delivery of corn and that Smith could not extend the delivery time indefinitely at his discretion. No genuine issue of material fact exists as to the legality of these contracts based on the evidence submitted by Countrymark. *Kulch v. Structural Fibers* (1997), 78 Ohio St.3d 134, 145, 677 N.E.2d 308, 317.

Though the moving party has the initial burden to come forward with evidence in support of its motion for summary judgment, once " 'the moving party has satisfied its initial burden, the nonmoving party then has a reciprocal burden outlined in Civ. R. 56(E) to set forth specific facts showing that there is a genuine issue for trial and, if the nonmovant does not so respond, summary judgment, if appropriate, shall be entered against the nonmoving party.' " *Kulch,* 78 Ohio St.3d at 145, 677 N.E.2d at 317, quoting *Dresher v. Burt* (1996), 75 Ohio St.3d 280, 295, 662 N.E.2d 264, 275. Further, "[s]ummary judgment requires the party opposing the motion to produce evidence on any issue for which that party bears the burden of proof at trial." *Nice v. Marysville* (1992), 82 Ohio App.3d 109, 116, 611 N.E.2d 468, 472. Because Smith bears the burden of establishing at trial his affirmative defense of illegality of contract, Smith must bring forth evidence of illegality to survive Countrymark's motion for summary judgment. *Dresher,* 75 Ohio St.3d 280, 295, 662 N.E.2d 264, 275.

Smith submitted the following evidence: first, affidavits from his marketing advisor Roger Wright and himself; second, an attachment to the first contract entered into between himself and Countrymark, entitled Attachment 110; third,

correspondence between Countrymark and Roger Wright; and, fourth, a civil compliant filed by the Commodity Futures Exchange Commission ("CFTC") against an affiliate of Countrymark, Buckeye Countrymark, as well as Smith's marketing advisor Roger Wright.

Smith also attempts to place before this court the deposition of Daniel Webb. However, the Webb deposition was not taken as part of this action, but rather as part of an unrelated action before the Common Pleas Court of Hancock County, *CoBank, ABC Corp. v. Bower et al,* No. 96–307–OC. The Webb deposition was not before the trial court when ruling on Countrymark's motion for summary judgment. This deposition was attached to Smith's motion for reconsideration of that ruling.

■ For evidence to be considered on a motion for summary judgment, it must be "timely filed in the action." Civ. R. 56(C) and Civ. R. 32(A). Because the Webb deposition was not filed in time to permit the trial court to consider it when ruling on the motion for summary judgment, it was not timely and cannot be considered here. *Nice,* 82 Ohio App.3d 109, 611 N.E.2d 468.

■ Further, Smith's argument that the Webb deposition was newly discovered evidence presented to the court in a motion for reconsideration is not well taken either. The civil rules do not permit a motion for reconsideration of a final judgment. Civ. R. 54(B). A motion for reconsideration may be made only as to an interlocutory order. *Pitts v. Ohio Dept. of Transp.* (1981), 67 Ohio St.2d 378, 21 O.O.3d 238, 423 N.E.2d 1105. Because the order of summary judgment entered by the trial was a final order, the subsequent motion for reconsideration and exhibits attached thereto were outside of rule. *Id.* Accordingly, any evidence sought to be introduced through this vehicle was improper and cannot be considered as part of the record on which summary judgment was ordered.

■ Smith's deposition testimony and affidavits demonstrate at best that he might not have understood all the terms within the contracts he was signing. Smith testified that he relied on his marketing advisor, Roger Wright, to inform him of the contract details. However, Smith, not his agent, signed all eleven contracts. Ignorance as to contract terms is no defense when one signs a contract without proper precaution. *McAdams v. McAdams* (1909), 80 Ohio St. 232, 88 N.E. 542; *Pippin v. M.A. Hauser Ent.* (1996), 111 Ohio App.3d 557, 676 N.E.2d 932.

Attachment 110 relates only to the first of the eleven contracts. Upon review of this document, we find no terms that can be read to permit Smith to extend the date of delivery of corn to Countrymark. This document, at best, demonstrates that Smith had the right to change pricing options, not delivery dates. The document states in part:

"The Opportunity Plus Contract (OPC) contains many pricing alternatives which may be exercised. *Prior to the designated delivery period,* customer may change pricing options as often as desired. However, customer understands that the selection of pricing options (or the change therefrom) involves price risk." (Emphasis added.)

Smith also points to three letters from Countrymark to Smith's marketing advisor, Roger Wright, as evidence of Smith's right to indefinitely extend the delivery dates under his contracts. This correspondence, however, at most indicates that Smith could only request that Countrymark extend the delivery dates on his contracts. Further, the letters make clear that no issue exists as to whether the parties intended that the corn never be delivered. In defendant's exhibit No. 4, the letter from Kenneth Parrent of Countrymark responds to Roger Wright's request on behalf of Smith and another farmer to change the delivery period from January 1996 to July 1996 and states:

"I am willing to consider your request for Duvall and Smith if you are willing to make a firm commitment on the number of bushels to be delivered in July. *I do not wish to roll the delivery on these contracts indefinitely, particularly where the customer has the ability to make delivery in this crop year.* I am willing to defer delivery beyond July if the customer finds himself unable to deliver because of a shortfall in production, or where contracts are the result of the exercise of options. This is per our Opportunity Plus agreement, and has always been the case." (Emphasis added.)

Smith's final exhibit, the CFTC complaint filed against Countrymark's affiliate, Buckeye Countrymark, offers no explanation of the contracts in this case. This complaint describes contracts that permit grain sellers to indefinitely roll the delivery date. The complaint further alleges that the parties to the contracts never intended to actually deliver grain. The contracts here are clearly distinguishable. The Smith and Countrymark contracts require delivery during a specific delivery period, and no evidence has been introduced that indicated that the parties actually intended never to deliver grain pursuant to the contracts.

Upon consideration of all the evidence in a light most favorable to Smith, we cannot say that the trial court erred when granting summary judgment in favor of Countrymark. No genuine issue exists as to whether Smith and Countrymark intended to deliver corn upon their contracts. Smith testified that he intended to deliver corn to Countrymark and would even buy corn off the market if necessary to fulfill his contractual obligation. The most generous reading of the correspondence from Countrymark to Smith indicates only that Countrymark contemplated extending the delivery of corn, but continued to seek actual delivery from Smith. Smith has presented no evidence that creates an issue of fact as to his affirmative

defense of illegality of contract. *Kulch*, 78 Ohio St.3d 134, 677 N.E.2d 308. Summary judgment was properly granted in favor of Countrymark.

Smith's first assignment is overruled.

## II

In Smith's second assignment of error, he argues that the trial court erred in finding for Countrymark as a matter of law on the issue of Countrymark's alleged breach of the eleven grain contracts. Smith argues that Countrymark breached the agreements by refusing to extend the delivery periods for corn when requested by Smith.

The agreements between Smith and Countrymark concern the purchase and sale of goods, corn. Accordingly, these written agreements are governed by R.C. Chapter 1302 (codifying the UCC Article 2). *Burkhart v. Marshall* (1989), 63 Ohio App.3d 281, 578 N.E.2d 827. R.C. 1302.05 limits a court's consideration of contradictory evidence outside "a writing intended by the parties as a final expression of their agreement." Contrary to Smith's argument, the terms of these agreements can only be read as clear and unambiguous. Further, the contracts all contain the following integration clause:

"15. This agreement constitutes the entire understanding of the parties, and may be modified only by a signed writing of both parties, excepting Purchaser's right to extend this contract, and is binding on their heirs, assigns and successors of the parties."

As noted above, no reading of these eleven, fully integrated contracts can be said to require Countrymark to extend the date of delivery merely because Smith so requests. Only the purchaser, Countrymark, at its sole option could extend the date of delivery. Further, evidence of a course of dealing, where Countrymark extended the delivery date once on these contracts, still does not present a set of facts showing that Smith had the right to extend the delivery periods at his sole discretion.

Smith's second assignment of error is overruled.

## III

Smith's third assignment of error claims that the trial court erred in finding for Countrymark as a matter of law on Smith's claim that he was fraudulently induced to enter into the eleven grain contracts. Specifically, Smith claims that Countrymark promised him he had the right to extend the delivery periods for his corn at his discretion. The prima facia elements of a claim for fraudulent inducement are (1) a representation, (2) material to the transaction, (3)

which is made falsely, with knowledge of it falsity or with utter disregard and recklessness as its falsity, (4) intent to mislead, (5) justifiable reliance on the representation, and (6) a resulting injury. *Burr v. Stark Cty. Bd. of Commrs.* (1986), 23 Ohio St.3d 69, 23 OBR 200, 491 N.E.2d 1101.

Smith could not recall whether any representations were made to him personally by Countrymark promising him the right to extend indefinitely the delivery periods for his promised corn. Without evidence of a representation, a claim for fraudulent inducement cannot be made. *Id.*

Nevertheless, Smith contends that oral inducements were made to his agent, Roger Wright. Smith reasons that since Countrymark required Smith to execute a power of attorney permitting Roger Wright to act on Smith's behalf, Countrymark's representations to Wright were representations to Smith. Even if the evidence could demonstrate an agency relationship between Smith and Wright, the written agreements, signed by Smith, expressly contradict the alleged representations made by Countrymark to Wright.

The parol evidence rule codified in R.C. 1302.05 states:

"Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented:

"(A) by course of dealing or usage of trade * * * or by course of performance * * * and

"(B) by evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive state of the terms of the agreement."

As noted above, all eleven contracts contained the following clause:

"15. This agreement constitutes the entire understanding of the parties, and may be modified only by a signed writing of both parties, excepting Purchaser's right to extend this contract, and is binding on their heirs, assigns and successors of the parties."

These contracts were fully integrated documents. Accordingly, Smith may not introduce evidence that he, the seller, had the right to indefinitely extend the date of delivery under the contracts when such evidence is in direct opposition to the written agreement. As stated in *Marion Production Credit Assn. v. Cochran* (1988), 40 Ohio St.3d 265, 274, 533 N.E.2d 325, 334, "[t]he Statute of Frauds may not be overcome by a fraudulent inducement claim which

alleges that the inducement to sign the writing was a promise, the terms of which are directly contradicted by the signed writing."

Smith's third assignment of error is overruled.

## IV

Smith's fourth assignment claims that a genuine issue of material fact exists as to whether he is entitled to damages as a result of Countrymark's violation of several federal Acts: the Commodity Exchange Act, Section 1 *et seq.*, Title 7, U.S.Code; the Capper–Volstead Act, Section 291 *et seq.*, Title 7, U.S.Code; and the Clayton Antitrust Act, Section 17, Title 15, U.S.Code.

Smith's theory of action under each act is rooted in the assumption that the eleven HTA contracts he entered into were illegal futures contracts that permitted unlimited rolling of the delivery date of grain. This court has already determined that no evidence in the record supports this construction of the contracts. Accordingly, just as Smith had no defense under the Commodity Exchange Act for his breach of the agreements, he has no cause of action for its alleged violation.

Further, the Capper–Volstead Act and the Clayton Antitrust Act are generally considered statutes that empower agricultural cooperatives to engage in market activities free from most antitrust violations. *Maryland & Virginia Milk Producers Assn. v. United States* (1960), 362 U.S. 458, 80 S.Ct. 847, 4 L.Ed.2d 880. The enforcement of these acts is within the discretion of the Secretary of Agriculture pursuant to Section 292, Title 7, U.S.Code. The secretary may direct a cease-and-desist order to a cooperative that has engaged in activities that may have "monopolized or restrained trade to such an extent that the price of an agricultural commodity has been 'unduly enhanced.'" *Milk Producers Assn.*, 362 U.S. at 462, 80 S.Ct. at 851, 4 L.Ed.2d at 885. Smith has failed to identify any set of facts that could entitle him to relief pursuant to these acts.

Smith's fourth assignment is overruled.

*Judgment affirmed.*

EVANS, P.J., and SHAW, J., concur.