FARMERS COMMISSION COMPANY, Appellee,

v.

BURKS, Appellant.

[Cite as *Farmers Comm. Co. v. Burks* (1998), 130 Ohio App.3d 158.]

Court of Appeals of Ohio,
Third District, Wyandot County.

No. 16–98–02.

Decided Sept. 30, 1998.

*G. Scott McBride,* for appellee.

*E.R. Weàd,* for appellant.

HADLEY, Judge.

Defendant–appellant, Charles Frederick Burks, is appealing from the March 2, 1998 judgment of the Wyandot County Court of Common Pleas granting summary judgment to plaintiff-appellee, Farmers Commission Company ("Farmers Commission"). After a review of this matter, the court hereby removes this

appeal from the accelerated calendar and issues an opinion in accordance with App.R. 12.

In April and May 1995, Burks allegedly entered into four Hedge to Arrive ("HTA") contracts with the U.S. Commission Company [1] through its agent, John Stoneburner, to sell twenty thousand bushels of corn with the futures delivery month of December 1995. Farmers Commission claims to have sent Burks a purchase confirmation letter for each contract; Burks, however, contends that he did not see the confirmation letters until May 1996 when he requested to see the alleged contracts. Burks elected to roll his contracts forward until July 1996 and he sold his 1995 harvested corn on the open market.

On June 6, 1996, Burks's attorney sent a letter to Farmers Commission stating that he was advising Burks not to honor any of the proposals concerning HTA situations unless Farmers Commission had proof of service of the contracts upon Burks. On receipt of the letter, Farmers Commission suggested a meeting to resolve the dispute. No meeting occurred, and on July 2, 1996, Farmers Commission demanded payment for damages, stating that it had cancelled the contracts.

Farmers Commission filed suit against Burks and both parties filed motions for summary judgment. The trial court granted Farmers Commission's motion for summary judgment and awarded damages in the amount of $50,250.

It is from this judgment that Burks is appealing, assigning the following error:

"The trial court erred in grating [sic] summary judgment in favor of the plaintiff-appellee Farmers Commission Co. and against the defendant-appellant, Charles Frederick Burks."

From a thorough review of the record, it appears that Burks contends that having the evidence construed most strongly and favorably in his favor, there are genuine issues of material fact as to the following nine items: (1) whether there was the requisite meeting of the minds to form contracts between Farmers Commission and Burks, (2) whether the defense of the Statute of Frauds is valid, (3) whether the written contract terms and conditions were valid or if they needed to be explained, (4) whether Farmers Commission had a duty to inform Burks of the risks involved in a HTA contract and whether Farmers Commission breached that duty by misrepresentation, (5) whether the oral agreements violate the regulations established by the Commodity Futures Trading Commission, (6) whether Burks had the ability to deliver on the contracts in July 1996, (7) whether Farmers Commission improperly cancelled the agreements, (8) whether

---

1. As of September 1, 1996 the U.S. Commission Company merged with the Ada Exchange and is now known as Farmers Commission Company. The U.S. Commission Company will be hereinafter referred to as "Farmers Commission" for clarity.

Farmers Commission could have mitigated its damages by letting Burks buy out the contracts while his damages were less, and (9) whether the amount of damages is correct.

Summary judgment is appropriate when (1) there is no genuine issue of material fact, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds can come to but one conclusion, and that conclusion is adverse to the party against whom the motion for summary judgment is made. *State ex rel. Howard v. Ferreri* (1994), 70 Ohio St.3d 587, 589, 639 N.E.2d 1189, 1192–1193.

When reviewing a summary judgment motion, we must independently review the record to determine if summary judgment was appropriate. *Morehead v. Conley* (1991), 75 Ohio App.3d 409, 411–412, 599 N.E.2d 786, 787–788 Therefore, we will review the trial court's granting of summary judgment *de novo*. *Childers v. Whirlpool Corp.* (1995), 106 Ohio App.3d 52, 56, 665 N.E.2d 256, 257–258 citing *Smiddy v. Wedding Party, Inc.* (1987), 30 Ohio St.3d 35, 36, 30 OBR 78, 78–79, 506 N.E.2d 212, 214–215.

It is well settled that the party seeking summary judgment bears the initial burden of showing that no genuine issue of material fact exists for trial. *Dresher v. Burt* (1996), 75 Ohio St.3d 280, 293–294, 662 N.E.2d 264, 273–275; *Mitseff v. Wheeler* (1988), 38 Ohio St.3d 112, 115, 526 N.E.2d 798, 801–802. Once the initial burden has been met, the nonmoving party then has a reciprocal burden to set forth specific facts showing that there is a genuine issue for trial. *Dresher,* 75 Ohio St.3d at 293, 662 N.E.2d at 273–274.

I

Burks contends that a genuine issue of material fact exists as to whether there was the requisite meeting of the minds between Farmers Commission and himself to form the alleged HTA contracts.

A contract is a promise or a set of promises for the breach of which the law gives a remedy, or the performance of which the law in some way recognizes a duty. *Episcopal Retirement Homes, Inc. v. Ohio Dept. of Indus. Relations* (1991), 61 Ohio St.3d 366, 369, 575 N.E.2d 134, 137, citing Restatement of the Law 2d, Contracts (1981) 5, Section 1. "An express contract connotes an exchange of promises where the parties have communicated in some manner the terms to which they agree to be bound." *Cuyahoga Cty. Hosps. v. Price* (1989), 64 Ohio App.3d 410, 415, 581 N.E.2d 1125, 1128. For a contract to exist, each party must consent to the terms of the contract, the parties must have a meeting

of the minds, and the contract must be definite and certain. *Episcopal Retirement Homes, Inc.*, 61 Ohio St.3d at 369, 575 N.E.2d at 137.

"In a basic HTA contract, farmers promise to deliver grain at a specific date in the future and purchasers promise to pay an agreed futures price set by reference to the Chicago Board of Trade (CBOT), plus or minus a basis, which accounts for local fluctuation in price. *Eby v. Producers Co-op* (W.D.Mich.1997), 959 F.Supp. 428 (fn 1). The basis can float until fixed by the farmer at any time prior to delivery. *Id.* If basis is not fixed prior to delivery, it will automatically be set by the terms of the contract. *Id.*

"HTA contracts may benefit farmers by permitting them to lock in a favorable price per bushel of grain well before harvest, avoiding the normal market downturn at harvest time. *Id.* The risk, however, is that grain prices could rise, as they did in the Fall of 1995, and a farmer could be forced to comply with the agreed price per bushel, well below current market value. *Id.*" *Countrymark Coop., Inc. v. Smith* (1997), 124 Ohio App.3d 159, 705 N.E.2d 738.

█ Burks is a merchant under the definition section of the sales provisions of Ohio's Uniform Commercial Code, R.C. 1302.01(A)(5):

" 'Merchant' means a person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction * * *."

R.C. 1302.01(A)(7) states that " '[b]etween merchants' means in any transaction with respect to which both parties are chargeable with the knowledge or skill of merchants." A farmer, such as Burks, with thirty years' experience in the industry, who previously sold crops, and keeps abreast of the farm market is "chargeable with the knowledge or skill of merchants" referred to in R.C. 1302.01(A)(7), in placing orders to sell corn. See *Burkhart v. Marshall* (1989), 63 Ohio App.3d 281, 578 N.E.2d 827. As both Burks and Farmers Commission were merchants who made agreements for the purchase and the sale of goods, corn, the agreements are governed by R.C. Chapter 1302. See *Countrymark, supra,* citing *Burkhart,* 63 Ohio App.3d at 284, 578 N.E.2d at 828–829.

In accordance, R.C. 1302.10(C) provides:

"Conduct by both parties that recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such case, the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under [Chapters 1301–1310, inclusive] of the Revised Code." See *Alliance Wall Corp. v. Ampat Midwest Corp.* (1984), 17 Ohio App.3d 59, 63–64, 17 OBR 114, 118–119, 477 N.E.2d 1206,

1211 and *Robinson Mem. Hosp. v. Hi Temp, Inc.* (July 14, 1995), Portage App. No. 94–P–0096, unreported, 1995 WL 453430.

In April 1995, Burks went to Farmers Commission and met with John Stoneburner, an agent of Farmers Commission. In his deposition, Burks stated the following about his conversation with Stoneburner concerning his discussion in determining whether to enter into a HTA contract or a straight contract:

"A. And there was only a difference of like three to five cents or something. There wasn't much difference between an HTA and what I could have contracted at the time. And I questioned him about the HTA's. I said, How do they work? What would be the advantage?

"And he said, There is a couple of advantages. The first one is if you can't fill the contract, in other words if you contract thirty thousand bushel and you only have twenty thousand, you could roll the other ten thousand next year and get two forty-five or whatever for your corn.

"And I said—at that time, I said, Two forty-five, because we were contracting for two sixty-five.

"Then he said, You've got to set your basis, and that's when I found out what a basis was, and that's the difference between Chicago and what U.S. Commission Company is giving. And at that time, in September, it's suppose to be smaller, and that's the reason why you set it then, not when your bringing the corn in, because it's larger at that time.

"Q. Okay

"A. And he—he says—I said, Well—and he said, Another thing is if corn goes up, wouldn't you rather have $3.00 corn, if it went to $3.00, instead of the two forty-five?

"I said, I sure would. That would help out.

"He said, Then take your two forty-five the next year.

"I said, Well, that sounds pretty good. So I ordered—I did ten thousand bushel at that time.

" * * *

"Q. What other questions did you ask him about, and what was his response?

"A. I asked him—I said, To roll them—the first thing I asked him was what does it cost to roll them? And he said, Three to five cents.

" * * *

"A. Yeah. And I said, I don't want to be involved with Chicago Board of Trade, because I did that one time, and I lost my butt, and I'm not doing it again.

He said, it has nothing to do with that. You don't have to worry about that. And I said, Fine. So I even questioned him about it, because it just seemed too good to be true really. But it sounded like you can't go wrong with this, if you get the higher price one year and get the same price the next year what you agreed on this year and it's only going to cost you three to five cents. You know, it sounded like—and I had to do something. I had to sign a contract now anyway. Do you understand? Because Ag Credit wanted me to make sure there was bushels.

" * * *

"Q. Okay. So the figure that he gave you for two sixty-five a bushel, at least in your mind, was a price of corn that you thought you were going to make a profit on?

"A. Right. Correct. I'll go along with that.

"Q. Okay. All right. So you weren't completely—you understood what the farm prices were when you were negotiating that price?

"A. He said two sixty-five and usually you set the basis from eighteen to twenty cents. I was getting two forty-five. He kept bringing the price up to two forty-five. All the time he stressed coming in September and setting your basis. Come in September and set the basis. That's the big thing he stressed."

Burks then explained that he contracted for another ten thousand bushels at $2.64 ¾ per bushel. The first ten thousand bushels were contracted for $2.65 per bushel.[2]

As his deposition demonstrates, Burks was aware that he was entering into the HTA contracts. Burks knew that he was contracting to deliver ten thousand bushels of corn at $2.65 per bushel and ten thousand bushels of corn at $2.64 ¾ per bushel to Farmers Commission. All twenty thousand bushels were scheduled to be delivered in December 1995 and the contracts required Burks to set a basis. In addition, Burks knew how the basis was determined, as he stated that it was the difference between CBOT and what the Farmers Commission was giving. Moreover, he knew that the basis was smaller in September and that it was better to set the basis when it was smaller. Thus, Burks, himself, understood that he was entering into the HTA contracts. Burks admits that the contracts to sell twenty thousand bushels of corn that were requested by him in April and May 1996 are accurate as to the above terms. Accordingly, we find that there is no genuine issue of material fact as to whether the contracts exist.

---

2. Farmers Commission alleges that Burks placed four separate orders of five thousand bushels each by phone through April and May 1995. Farmers Commission concedes that ten thousand bushels were ordered at $2.65 per bushel and ten thousand bushels were ordered at $2.64 ¾ per bushel.

Burks does dispute whether he had complete knowledge of the process by which a HTA contract may be rolled. Thus, he argues, there is a genuine issue of material fact as to whether there was a sufficient meeting of the minds on this issue as it relates to HTA contracts.

Under the HTA contracts in question, Burks was allowed to extend his delivery obligation from December 1995 to July 1996. *Eby*, 959 F.Supp. at 428, fn. 1; *Countrymark, supra.* That is, Burks could "roll" each of the contracts. *Countrymark, supra.* Thus, when the market rose, Burks was able to extend his original delivery period of December 1995 and sell his current harvest to another buyer at a more favorable price. *Id.* Usually, the farmer then waits for the market to return to a lower position before fulfilling their original obligation. *Id.* When Burks changed his delivery date from December 1995 to July 1996, he exposed himself to the difference in price between one futures contract month (December) and another (July); that is, Burks exposed himself to a spread. *Id.*

In his deposition, Stoneburner claims that he explained the risks of a HTA contract roll and spread to Burks through an example:

"A. Usually what I did was use an example of what you have to be careful of. I usually used the example of wheat. And the reason I use that is because I saw practical experience of that. You have to be very careful when you roll these contracts from one year to the next, because sometimes the spread, or the difference between one future's contract month and another, can go for or against you. And I had seen wheat go against the farmer fifty cents a bushel. I used that because most farmers understand fifty cents is a lot of money to lose. And that way I was trying to make sure they saw the risk involved.

"Q. Okay. Are you sure that you told Fred Burks about the risk involved, such as this word—use of the word 'spread'?

"A. To my best recollection, yes, sir, I did that to everyone who did a hedge to arrive contract."

Burks, however, claims that in April 1995, Stoneburner told him that it would only cost three to five cents per bushel to roll the contracts when he first entered into the contracts. In September 1995, Burks went to see Stoneburner about the contracts. In his deposition, Burks stated the following about that visit:

"A. We discussed what to do. I went in there. I didn't even know what to do. Like I came in there and I said, John, what should we do, because corn was up to like—I'm guessing again—two eighty-nine or something like that. It was pushing close to $3.00. I said, What should I do? Should I take the money, or should I fill the contracts? And so he said—well, he put it to me this way. Do you want two forty-five for your corn, or do you want two eighty-nine for your corn or whatever it was. I think he said $3.00, but I don't think corn was $3.00 at

the time, but I think his words were $3.00. And I said, Well, I'll tell you one thing. $3.00 or the two eight-nine or whatever the price was, I said, looks a lot better than the two forty-five. Well, we'll roll them over and get two forty-five next year. I said, Fine. That sounds good to me. That's what I'll do. At that time, I though this was done.

"* * * *

"Q. And you understood that next year you would have to fulfill those contracts at the two forty-five level?

"A. Correct.

"Q. An you also understood that the corn market could even be higher the following year than it was when you were there at the end of '95?

"A. Right."

The contracts apparently were not rolled by Farmers Commission until the end of November 1995 when an employee of Farmers Commission called Burks to inquire about the contracts. During the conversation, Burks learned that it would cost seventy cents a bushel to roll the HTA contracts until December 1996. Burks decided to roll the contracts over to July 1996 because it would not cost anything, but his futures month changed from December 1995 to July 1996. By altering the futures month, Burks exposed himself to the market risk of a spread.

As discussed, Burks acknowledges that he contracted to sell ten thousand bushels of corn at $2.65 per bushel and ten thousand bushels of corn at $2.64 ¾ per bushel to Farmers Commission for delivery in December 1995 with the basis to be set prior to delivery. By authorizing Kilgore to roll the contracts, Burks authorized the contract modifications to change the delivery date of the contracted corn from December 1995 to July 1996. Rolling over his contracts to July 1996 did not cost him anything; however, Burks then became subject to the spread.

Thus, Burks knowingly entered into the oral HTA contracts for delivery in December 1995 and he made contractual modifications to roll the HTA contract until July 1996. Accordingly, we find that there is no genuine issue of material fact as to a meeting of the minds of Burks and Farmers Commission.

## II

Burks contends that a genuine issue of material fact exists as to whether the Statute of Frauds defense is valid.

As the contracts between Burks and the Farmers Commission are for the sale of goods over $500, the oral contracts between himself and Farmers Commission are unenforceable pursuant to R.C. 1302.04(A). *Burkhart*, 63 Ohio App.3d at 283,

578 N.E.2d at 828. An exception, however, exists under R.C. 1302.04(C)(2). R.C. 1302.04(C)(2) provides that a contract is enforceable if the party against whom enforcement is sought admits that a contract for sale was made. The contract is only enforceable under R.C. 1302.04(C)(2) for the quantity of goods admitted in his pleadings, testimony, or in court.

As discussed, in his deposition, Burks admitted to entering into the contracts to sell Farmers Commission twenty thousand bushels of corn for delivery in December 1995 with a basis required to be set before delivery. Thus, the Statute of Frauds defense is not applicable. Accordingly, we find that no genuine issue of material fact exists on this point.

## III

Burks contends that a genuine issue of material facts exists as to whether the written contract terms and conditions were valid or if they needed to be explained. By this argument, Burks appears to assert that parol evidence is necessary to explain the agreed upon terms and conditions of the HTA contracts.

R.C. 1302.05 describes the applicable parol evidence rule and states:

"Terms with respect to which the *confirmatory memoranda* of the parties agree or which are otherwise set forth in a *writing* intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented:

"(A) by course of dealing or usage of trade as provided in section 1301.11 of the Revised Code or by a course of performance as provided in section 1302.11 of the Revised Code; and

"(B) by evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement." (Emphasis added.)

As we have found the existence of only oral agreements, we find that the parol evidence rule is inapplicable. Thus, construing the evidence most strongly in favor of Burks, we find that a question of fact does not exist as to whether the parol evidence rule is implicated.

## IV

Burks contends that a genuine issue of material fact exists as to whether Farmers Commission had a duty to inform Burks of the risks involved in HTA contracts and whether Farmers Commission breached that duty by misrepresentation. From an examination of the record and Burks's arguments, we construe

the issue as whether there exists a genuine issue of material fact as to whether Farmers Commission fraudulently induced Burks into entering into the HTA contracts.

Burks claims that Stoneburner, an agent of Farmers Commission, misrepresented the risk involved in rolling the HTA contracts. Specifically, Burks claims that Stoneburner told him it·would only cost three to five cents per bushel to roll the contracts and that the CBOT was not involved in the process of rolling the contracts.

 Fraud under the Commodity Exchange Act is substantially the same claim as the law of fraud in Ohio. See *ABM Farms, Inc. v. Woods* (1998), 81 Ohio St.3d 498, 502, 692 N.E.2d 574, 577–578, and Section 6(b), Title 7, U.S. Code. "In order to prove fraud in the inducement, a plaintiff must prove that the defendant made a knowing, material misrepresentation with the intent of inducing the plaintiff's reliance, and that the plaintiff relied upon that misrepresentation to her detriment." *ABM Farms, Inc.*, 81 Ohio St.3d at 502, 692 N.E.2d at 578, citing *Beer v. Griffith* (1980), 61 Ohio St.2d 119, 123, 15 O.O.3d 157, 160, 399 N.E.2d 1227, 1231.

The first issue is whether Stoneburner made knowing, material misrepresentations to Burks. The second issue is whether he made the misrepresentations to induce Burks into the HTA contracts. The third issue is whether Burks can demonstrate that the misrepresentations were the proximate cause of his loss, *i.e.*, Burks justifiably relied on Stoneburner's misrepresentations.

We cannot find that a genuine issue of material fact exists as to whether the alleged misrepresentations induced Burks into entering into the HTA contracts. Burks, in his deposition, states that he had to enter into a contract at the request of Ag Credit. Burks asked about the differences of a straight contract and HTA contracts. He then chose to enter into HTA contracts. He knew that his delivery date for the corn was December 1995 and he had to set his basis prior to delivery. Thus, the fact that Stoneburner may have quoted Burks a certain price for rolling his contracts is irrelevant. Burks knew the obligations of the contract when he contracted to sell twenty thousand bushels of corn to Farmers Commission. The fact that he chose to roll the contracts was his choice; he was not induced into entering into the contracts based upon the cost of rolling the contracts. Thus, we find that there exists no genuine issue of material fact as to whether Burks was induced into entering into the contracts by Stoneburner's alleged quote on what it would cost to roll the contracts. Accordingly, we need not discuss whether Stoneburner made knowing, material misrepresentations or whether Burks can demonstrate that the misrepresentations were the proximate cause of his loss.

## V

██ Burks contends that a genuine issue of material fact exists as to whether the contract was in violation of regulations established by the Commodity Futures Trading Commission.

In his answer, Burks urged that the oral contracts are in violation of the regulations established by the Commodity Futures Trading Commission and constitute illegal trade options. The record is absent of any evidence to support Burks's contentions. In addition, in his deposition, Burks claims to have no knowledge of the alleged violations.

The HTA contracts were entered into with Burks, a farmer, who is a producer of grain. Burks was able to make delivery of the grain in December 1995, but he chose to roll his contracts over to July 1996 and then it was up to him to get grain to fulfill the contracts, buy out the contracts, or roll them over. Farmers Commission was in the business of obtaining grain under contracts for resale and relied upon actual delivery of it to carry on its business. Farmers Commission had the capacity to take delivery of the grain contracted. The HTA contracts were entered into with the expectation of actual, albeit deferred, delivery.

Burks has failed to identify any set of facts, which if believed, could entitle him to relief. See *Countrymark, supra.* Applying the standards of Civ.R. 56(C) and construing the evidence most strongly in favor of Burks, we find that a question of fact does not exist as to whether the HTA contracts were in violation of the regulations established by the Commodity Futures Trading Commission or whether the HTA contracts constituted illegal trade options.

## VI

Burks contends that a genuine issue of material fact exists as to whether he had the ability to deliver on the contracts.

In his deposition, Burks clearly demonstrated that he had sufficient quantity of corn in the fall of 1995. However, he chose to sell the corn on the open market. Applying the standards of Civ.R. 56(C) and construing the evidence most strongly in favor of Burks, we find that a question of fact does not exist as to whether he had the ability to deliver the required corn.

## VII

██ Burks apparently also contends that a genuine issue of material fact exists as to whether Farmers Commission wrongfully terminated the contracts and denied him the opportunity to buy out his contracts or roll the contracts over again.

In his motion for summary judgment, Burks argues that Farmers Commission improperly cancelled the HTA contracts on June 28, 1996. Prior to their cancellation, the agreements called for July delivery or July rollover of the twenty thousand bushels of corn by Burks. Farmers Commission claimed that it properly cancelled the contracts based upon a notice it received from Burks's attorney. The letter dated June 6, 1996 stated: "unless you have proof of service of the document upon Burks I am advising him at this time not to honor any of the proposals concerning HTA situations." On June 14, 1996, Farmers Commission replied suggesting a meeting to resolve the dispute.

On July 2, 1996, without a meeting occurring, Farmers Commission advised Burks through a letter that it was closing his account because "the departure of Burks for the North Woods at this critical time, left The U.S. Commission Co. with no alternative course of action," and based upon the June 6, 1996 letter from Burks's attorney. Farmers Commission cancelled the contracts on June 28, 1996 and in order to mitigate its damages, Farmers Commission purchased twenty thousand bushels of corn at July futures price of $5.1625 per bushel for a loss of $2.5125 per bushel.

█ Under R.C. 1302.68, the issue is whether reasonable minds could only conclude that Burks's departure and the June 6, 1996 letter constituted a repudiation of the contract. Generally, when a contracting party repudiates the contract prior to the time that such party's performance is due, an "anticipatory breach" or, more precisely, an "anticipatory repudiation" occurs, and the injured party has an immediate action for damages for total breach. Farnsworth, Contracts (1982) 627–628, Section 8.20.

█ "An anticipatory breach of contract by a promisor is a repudiation of the promisor's contractual duty before the time fixed for performance has arrived." *McDonald v. Bedford Datsun* (1989), 59 Ohio App.3d 38, 40, 570 N.E.2d 299, 301, citing *Smith v. Sloss Marblehead Lime Co.* (1898), 57 Ohio St. 518, 49 N.E. 695. Furthermore, repudiation of a contract by one party leaves the other free to cancel and resort to its remedies for breach. R.C. 1302.68(B).

█ "However, mere expression of doubt as to willingness or ability to perform is insufficient to constitute repudiation. Whether a party has repudiated a contract or merely expressed doubt as to willingness to perform is a question of fact. Once one party to a contract repudiates, the other party is entitled to a judgment without the necessity of tendering performance." (Citations omitted.) *Peebles Elderly Hous. Ltd. Partnership v. Titan Indemn. Co.* (Sept. 15, 1997), Adams App. No. 96CA631, unreported, 1997 WL 578735.

Once there has been a breach, a plaintiff has a duty to minimize damages. *Huggins Farms, Inc. v. Bucyrus Plaza Ltd.* (May 9, 1989), Crawford App. No. 3–86–4, unreported, 1989 WL 49484.

In the instant case, reasonable minds could only conclude that Burks anticipatorily repudiated the HTA contracts. The June 6, 1996 letter stated that Burks's attorney advised his client not to act unless Farmers Commission had proof of service of the contracts upon him. In addition, Burks left town to go to the North Woods. At that point, Farmers Commission justifiably concluded that Burks was not going to fulfill his contractual obligations and mitigated its damages.

Applying the standards of Civ.R. 56(C) and construing the evidence most strongly in favor of Burks, we find that a question of fact does not exist as to whether Farmers Commission improperly cancelled the HTA contracts.

## VIII

Burks contends that a genuine issue of material fact exists as to whether Farmers Commission could have mitigated his damages by letting him buy out the contracts while his damages were less.

In his deposition, Burks stated that he inquired about buying out the contracts in late January or early February 1996. At that time, Farmers Commission told Burks that he could buy the contracts for $23,400. Farmers Commission informed him that he should see his accountant before proceeding. When Burks attempted approximately five weeks later to buy out the contracts, Farmers Commission informed him that it would now cost $37,700. Burks became upset at the increase in price and left without buying out his contracts. Sometime after that, Burks spoke to Farmers Commission again about buying out his contracts and found out it was now going to cost $46,000. After each quote, Burks did not tender payment to buy out the contracts and there is no indication that Farmers Commission would have refused tendered payment from him.

Applying the standards of Civ.R. 56(C) and construing the evidence most strongly in favor of Burks, we find that a question of fact does not exist as to whether Farmers Commission would have allowed him to buy out his contracts to mitigate his damages.

## IX

Burks contends that a genuine issue of material fact exists as to whether the damages were accurate. R.C. 1302.87 and 1302.97 provide for damages in the amount of the difference between the market price at the time of the breach and

the contract price together with any incidental and consequential damages, but less expenses saved in consequence of the seller's breach.

Here, at the time of the anticipatory repudiation by Burks, the price per bushel of corn was $5.1625 per bushel. This caused a loss of $2.5125 per bushel for a total loss of $50,250. The trial court ordered the appropriate damages in the amount of $50,250. Accordingly, we find that a question of fact does not exist as to whether the damages given were accurate.

Upon consideration of all the evidence, in a light most favorable to Burks, we find that the trial court did not err when granting summary judgment in favor of Farmers Commission and Burks's sole assignment of error is overruled.

Accordingly, the judgment of the trial court is affirmed.

*Judgment affirmed.*

SHAW, P.J., and THOMAS F. BRYANT, J., concur.