DANIEL E. TERRERI & SONS, INC. et al., Appellees and Cross–Appellants,

v.

MAHONING COUNTY BOARD OF COMMISSIONERS
et al., Appellants and Cross–Appellees.

[Cite as *Daniel E. Terreri & Sons, Inc. v. Mahoning Cty. Bd.
of Commrs.*, 152 Ohio App.3d 95, 2003-Ohio-1227.]

Court of Appeals of Ohio,
Seventh District, Mahoning County.

No. 00 CA 269.

Decided March 10, 2003.

96

98

Henderson, Covington, Messenger, Newman & Thomas Co., L.P.A., James L. Messenger and Jerry M. Bryan, for appellees and cross-appellants.

Paul J. Gains, Mahoning County Prosecuting Attorney, Linette S. Baringer, Chief Assistant, Civil Division, and Constance E. Pierce, Assistant Prosecuting Attorney, for appellants and cross-appellees.

---

WAITE, Presiding Judge.

{¶ 1} This timely appeal and cross-appeal arise out of bench trial in the Mahoning County Court of Common Pleas in which appellants were found to be in breach of two construction contracts. For the following reasons, judgment is reversed as to the breach-of-contract claims and judgment entered for appellants on these claims. The matter is to be remanded for further proceedings as to any amounts appellants may owe under the "termination for convenience" clauses of the contracts. Judgment is also reversed with respect to damages for lost bonding capacity, because appellees did not demonstrate that any other contracts were actually lost or that the parties contemplated lost bonding capacity when entering into these contracts.

{¶ 2} The record reveals that in 1996, Mahoning County became involved in a project to renovate the former Higbee building in downtown Youngstown so that it could be used for government office space. Title to the property was transferred to the county in 1996 to facilitate the project. In June 1996, Terreri Construction Company, Inc. ("Terreri"), put in a bid to renovate the roof and atrium of the Higbee building ("roof/atrium contract"). At the same time, Terreri and Avila Contracting and Supply Company, Inc. ("Avila Supply"), put in a bid, as a joint venture, on another part of the project calling primarily for demolition work in the Higbee building ("demolition contract"). Terreri and Avila Supply are appellees in this appeal.

{¶ 3} On July 30, 1997, the Mahoning County Board of Commissioners recommended awarding the roof/atrium contract to Terreri at a cost of $1,580,000, and recommended awarding the demolition contract to the Terreri/Avila Supply joint venture at a cost of $578,000. As part of the bidding process, Terreri filed bid guarantees and performance bonds in the amounts of the proposed contracts. There are documents in the record indicating that Terreri could obtain only a maximum of $3,000,000 worth of performance bonds approved by its insurance company. The record does not indicate that appellants were made aware of Terreri's bonding capacity.

{¶ 4} The parties all signed the contracts on September 18, 1997.

{¶ 5} Both appellees sent appellants a letter on October 10, 1997, requesting a notice to proceed and an increase of 15 percent in the contract price. The contracts had provisions that permitted appellees to begin work only after receiving a "notice to commence" from appellants. By letter, appellees threat-

ened to withdraw their bid if a notice to proceed or an increase in the contract price was not forthcoming by October 31, 1997.

{¶ 6} Appellees sent appellants another letter on October 23, 1997, declaring that if appellants issued a notice to proceed, appellants were also agreeing to an "equitable increase" in the contract price. Appellees once again proposed a 15 percent increase and declared that their bid was being withdrawn if no notice to proceed or letter of understanding was received by November 14, 1997.

{¶ 7} On December 1, 1997, appellees declared, by letter, that they were withdrawing from the contracts.

{¶ 8} On December 5, 1997, appellants transferred the title of the Higbee building to the Community Investment Corporation ("CIC"), an organization that facilitates public building projects in the city of Youngstown.

{¶ 9} Sometime between December 6, 1997, and January 6, 1998, Mr. Terreri spoke with Gary Kubic, Mahoning County Administrator, about whether the contracts could be assigned to or renegotiated with CIC. Nothing was resolved in this conversation.

{¶ 10} On January 6, 1998, appellants returned $2,000,000 to the state of Ohio that had been earmarked for the project.

{¶ 11} Sometime in early April 1998, the CIC announced that it was not going to renovate the Higbee building and was going to build a smaller version of an office tower on property next to the Higbee building.

{¶ 12} Appellees filed a breach-of-contract complaint on April 17, 1998. Appellees named four defendants: the Board of Mahoning County Commissioners ("board of commissioners"); Gary Kubic ("Kubic"), the county administrator; George Tablack ("Tablack"), Mahoning County Auditor; and Olsavsky–Jaminet Architects ("Olsavsky"). The first three of these defendants constitute the appellants in this appeal.

{¶ 13} Appellees' first cause of action involved an April 1996 contract for the removal of asbestos in the former Higbee building in downtown Youngstown. The second cause of action alleged a breach of the roof/atrium contract. The third cause of action alleged a breach of the demolition contract. The fourth cause of action alleged that appellants failed to release appellees' construction bond, which prevented them from pursuing other contracting work and which caused lost profits.

{¶ 14} On May 20, 1999, the trial court filed a judgment entry declaring that count one of the complaint had been settled and dismissing defendant Olsavsky from the case. Count one is not part of this appeal.

{¶ 15} On June 30, 1999, the remaining defendants filed a motion for summary judgment. They argued that (1) the terms of the contracts prohibited appellees from recovering damages due to any delays preventing completion of the contract, (2) appellees alleged no facts indicating the actual amount of lost profits, requiring the dismissal of count four of the complaint, and (3) Mahoning County Auditor Tablack should be dismissed from the suit.

{¶ 16} On August 2, 1999, appellees filed their motion in opposition to summary judgment. Appellees argued that they were not seeking damages for delays, but, rather, damages from being prevented from doing any work on the contracts. Appellees also presented evidence of their profits and losses from 1992–1998.

{¶ 17} On August 16, 1999, appellants filed a reply to appellees' brief in opposition to summary judgment. Appellants argued that the contracts contained "termination for convenience" clauses that allowed appellants' to terminate the contracts for no reason upon ten days' written notice, and, if the contracts so terminated, would create liability only for the percentage of the work already completed plus costs related to the termination. Appellants argued that they were justified in assuming that the termination for convenience clauses were constructively invoked after appellees sent letters stating that they were withdrawing from the contract unless the contract price was increased by 15 percent. Appellants urged the court to use the "termination for convenience" clause as a basis for granting their motion for summary judgment.

{¶ 18} The summary judgment motion was presented to a magistrate. The magistrate denied the motion on August 25, 1999. The magistrate also denied the request to have Auditor Tablack dismissed from the case. Appellants filed objections to the magistrate's decision. The objections were overruled by the trial court on October 29, 1999. Appellants filed an appeal of that decision with this court, which was designated Appeal Case No. 99 CA 296. On February 16, 2000, this court dismissed the appeal for lack of a final, appealable order, in which we held that the denial of motion for summary judgment is not immediately appealable.

{¶ 19} The case went to bench trial on October 25–27, 2000.

{¶ 20} On December 11, 2000, the trial court rendered its judgment. The court found that appellants failed to terminate the contracts in writing as required by the "termination for convenience" clauses. The court found that the "no damages for delay" clauses were inapplicable to a situation where appellants failed to issue a "notice to proceed." The court held that appellants' reliance on federal common law pertaining to "termination for convenience" did not apply because the contracts provided that Ohio law should apply.

{¶ 21}   The trial court held that appellants were in breach of both contracts, and awarded appellees $237,000 in lost profit damages for the atrium/roofing contract.   The court awarded appellees $115,600 in lost profit damages for breach of the demolition contract.   The court also awarded appellees $118,500 in lost bonding capacity damages for the delay in releasing the construction bond. Kubic and Tablack were dismissed from the case.   The court held that prejudgment interest was inappropriate and awarded interest to be paid from the date of the judgment.

{¶ 22}   On December 14, 2000, appellants filed this timely appeal.   Appellees have filed a cross-appeal.

{¶ 23}   On December 18, 2000, the trial court granted a stay of execution of the judgment pending appeal.

{¶ 24}   Although appellants present six assignments of error for review, the alleged errors can be analyzed as three issues for review:  (1) whether the "no damages for delay" clause protected appellants from being in breach of contract; (2) whether the "termination for convenience" clause protected appellants from being in breach of contract;  and (3) whether appellees provided evidence to justify lost profit damages based on appellants' delay in returning the performance bond.

{¶ 25}   Assignments of Error Nos. I and II deal with the "no damages for delay" and "termination for convenience" clauses of the contracts:

{¶ 26}   "The trial court erred in finding that appellants breached the atrium and roofing contract and interior demolition contract.

{¶ 27}   "The trial court erred in failing to find a constructive termination for convenience as a matter of law of both the atrium and roofing contract and the interior demolition contract."

{¶ 28}   Appellants argue that at no time have they been in breach of contract due to (1) the "no damages for delay" clauses;  (2) the legal theory of "termination for convenience";  and (3) the legal effect of three letters sent by appellees in October–December 1997, which declared that appellees were withdrawing from their contract responsibilities.

{¶ 29}   Appellants first rely on Article Twelve, Section (b) of the contracts, which sets forth the "no damages for delay" provisions:

{¶ 30}   "Any Contractor, Subcontractor, or other Contracting Party, shall have no claim against the County of Mahoning, or any of the agents or employees of the same, individually or collectively, for an increase in the contract price or a payment or allowance of any kind based upon any damage, loss, or additional expense, that such Contractor, Subcontractor, or other Contracting Party may

suffer as a result of any delays, including delays not contemplated by the parties in prosecuting or completing the work under this contract irrespective of the cause for such delay. It is understood that such Contractor, Subcontractor, or other Contracting Party assumes all risks of delay in prosecuting or completing the work under this contract."

{¶ 31} Appellants also implicitly rely upon "Schedule 'B': Commencement and Completion of Work," which states that work could not start until appellants delivered to appellees a written notice to commence. Work was required to be completed in "120 Calendar Days from written notice to commence" with respect to the atrium/roofing contract, and was required to be completed in 90 days for the demolition contract. There is nothing in "Schedule B" or in any other part of the contracts setting any time limits on the delivery of the written notice to commence work.

{¶ 32} Appellants argue that the "no damages for delay" clauses protected them from being in breach during the period of September 18, 1997 (the date the contracts were signed) until May 11, 1998 (the date that appellants returned appellees' performance bonds). The more important date, though, in determining whether appellants were in breach of contract, is October 10, 1997. This is the date of appellees' first letter to appellants declaring withdrawal from the contract if the bid price was not increased by 15 percent. If appellants were not in breach during the period of September 18, 1997, to October 10, 1997, then the issue arises as to the effect of appellees' letter on appellants' liability under the contract. As will be shown below, appellees' letter of October 10, 1997, together with their subsequent letters, significantly affect the outcome of this case.

{¶ 33} Appellees argue that the "no damages for delay" clauses do not apply where work is never commenced. Appellees' essential argument at trial and to this court is that appellants' delay in delivering a notice to proceed was not a delay contemplated by the "no damages for delay" clause. In other words, appellees contend that only delays that occurred after the start of construction were contemplated by the parties. Whether or not an event was contemplated by the contracting parties is determined first and foremost by examining the words of the contract. *Kelly v. Med. Life Ins. Co.* (1987), 31 Ohio St.3d 130, 31 OBR 289, 509 N.E.2d 411, paragraph one of the syllabus.

{¶ 34} The construction of written contracts is a matter of law that is reviewed de novo on appeal. *Long Beach Assn. v. Jones* (1998), 82 Ohio St.3d 574, 576, 697 N.E.2d 208.

{¶ 35} In Ohio, a "no damages for delay" clause is a valid and enforceable contract provision. *Carrabine Constr. Co. v. Chrysler Realty Corp.* (1986),

25 Ohio St.3d 222, 228, 25 OBR 283, 495 N.E.2d 952. The reason for enforcing such clauses is to protect the public:

{¶ 36} " '[T]hey protect public agencies which contract for large improvements to be paid for through fixed appropriations against vexatious litigation based on claims, real or fancied, that the agency has been responsible for unreasonable delays.' " *DiGioia Bros. Excavating, Inc. v. Cleveland Dept. of Pub. Util., Div. of Water* (1999), 135 Ohio App.3d 436, 450, 734 N.E.2d 438, quoting *Owen Constr. Co., Inc. v. Iowa State Dept. of Transp.* (Iowa 1979), 274 N.W.2d 304, 306.

{¶ 37} In *Carrabine Constr.*, the Ohio Supreme Court upheld summary judgment in favor of Chrysler Corporation because Carrabine Construction Company had entered into a contract with a "no damages for delay" clause. The "no damages for delay" clause in *Carrabine Constr.* is remarkably similar to the clause at issue in the instant appeal:

{¶ 38} "The Contractor shall have no claim against the Owner for an increase in the contract price or a payment or allowance of any kind based on any damage, loss or additional expense the Contractor may suffer as a result of any delays in prosecuting or completing the work under the contract, whether such delays are caused by the circumstances set forth in the preceding paragraph or by any other circumstances. It is understood that the contractor assumes all risks of delays in prosecuting or completing the work under the contract." Id. at 227, 25 OBR 283, 495 N.E.2d 952.

{¶ 39} *Carrabine* held that the broad and comprehensive "no damages for delay" provision was valid and enforceable. Id. at 228, 25 OBR 283, 495 N.E.2d 952.

{¶ 40} Similarly, the "no damages for delay" clauses of the atrium/roofing contract and the demolition contracts are written with very broad language, and there is nothing in the clauses which restrict their application to events occurring only after a "notice to proceed" has been delivered. As in *Carrabine*, the "no damages for delay" clauses cover delays in both "prosecuting" and "completing" the contracts. The term "prosecuting" is not defined in the contracts. Undefined terms in a contract are interpreted using the plain, ordinary meaning of the words. *Nationwide Mut. Fire Ins. Co. v. Guman Bros. Farm* (1995), 73 Ohio St.3d 107, 108, 652 N.E.2d 684. Black's Law Dictionary defines "prosecute" as "1. To commence and carry out a legal action. 2. To institute and pursue a criminal action. 3. To engage in; carry on." Black's Law Dictionary (7th Ed.Rev.1999) 1237. From this definition it can be seen that to "prosecute" means to initiate as well as to follow through on a project or activity.

{¶ 41} We conclude that the "no damages for delay" provisions in the two contracts sub judice encompassed delays in allowing appellees to begin work on the contracts. Therefore, appellants were not in breach merely because of such delays.

{¶ 42} Appellees might have been able to request damages for delay despite the "no damages for delay" provisions. There are several recognized exceptions to the enforceability of a "no damage for delay" clause. The exceptions consist of delay that " '(1) was not intended or contemplated by the parties to be within the purview of the provision; (2) resulted from fraud, misrepresentation, or other bad faith on the part of one seeking the benefit of the provision; (3) has extended such an unreasonable length of time that the party delayed would have been justified in abandoning the contract; (4) is not within the specifically enumerated delays to which the clause applies.' " *DiGioia Bros. Excavating, Inc.*, supra, 135 Ohio App.3d at 450–451, 734 N.E.2d 438, quoting *Jensen Constr. Co. v. Dallas Cty.* (Tex.App.1996), 920 S.W.2d 761, 770.

{¶ 43} While the record does not support that any of these exceptions existed, even assuming that all four exceptions apply, appellees cannot prevail here. Exceptions one, two, and four would have given appellees a basis to request damages for delay, but would not have justified the abandonment of the contracts. Only exception three would have allowed appellees to abandon the contracts. The record clearly reflects that appellees did abandon and repudiate the contracts by their letters dated October 10, 1997, October 23, 1997, and December 1, 1997. It is also apparent that, up to the point that appellees repudiated the contracts, any delays in delivering notices to proceed cannot be construed as unreasonable. Based on the above, the record reveals that appellees were in total breach of the contracts by anticipatory repudiation on December 1, 1997, and all subsequent events must be viewed in the light of that breach.

{¶ 44} "[W]hen a contracting party repudiates the contract prior to the time that such party's performance is due, an 'anticipatory breach' or, more precisely, an 'anticipatory repudiation' occurs, and the injured party has an immediate action for damages for total breach. Farnsworth, Contracts (1982) 627–628, Section 8.20." *Farmers Comm. Co. v. Burks* (1998), 130 Ohio App.3d 158, 172, 719 N.E.2d 980. The nonbreaching party may also rely on the anticipatory repudiation as a defense against a subsequent breach-of-contract claim. *Premium Enterprises, Inc. v. T.S., Inc.* (Feb. 9, 1999), 9th Dist. No. 2751–M, 1999 WL 61488; 13 Williston on Contracts (4th Ed.2000) 668, Section 39:37.

{¶ 45} "After acceptance, an attempted withdrawal amounts to an anticipatory breach of contract." Keyes, Government Contracts (2d Ed.1996) 307, Section 14.43.

{¶ 46} One form of anticipatory repudiation occurs when a party declares that he or she will not perform the terms of the contract unless the contract price is increased. *Nuco Plastics, Inc. v. Universal Plastics, Inc.* (1991), 76 Ohio App.3d 137, 141, 601 N.E.2d 152. Anticipatory repudiation does not rescind a contract, but, rather, constitutes a breach of contract. *Am. Bronze Corp. v. Streamway Products* (1982), 8 Ohio App.3d 223, 228, 8 OBR 295, 456 N.E.2d 1295.

{¶ 47} Notice of anticipatory repudiation gives the offended party the freedom to cancel its obligations under the contract. Farnsworth, Contracts (1982) 627–628, Section 8.20; *Farmers Comm. Co.,* supra, 130 Ohio App.3d at 172, 719 N.E.2d 980.

{¶ 48} "[W]hen one party to a contract repudiates the contract, or gives notice to the other party before the latter is in default that he or she will not perform, the nonrepudiating party is entitled to enforce the contract without previously performing or offering to perform the provisions of the contract in favor of the repudiating party. The repudiating party, by contrast, cannot demand performance from the nonrepudiating party, and may not sue the nonrepudiating party for nonperformance. Finally, when an action is brought by the repudiating party, anticipatory repudiation is not an affirmative defense that is required to be specifically pleaded in response." (Footnotes omitted.) 13 Williston (4th Ed.2000) at 668, Section 39:37.

{¶ 49} Although appellants do not specifically refer to the phrase "anticipatory repudiation," their posture during the trial of this case was that appellees breached the contracts by the declarations contained in the October 10, 1997, October 23, 1997, and December 1, 1997 letters, and that appellants' subsequent actions were, in part, an effort to salvage and protect their rights under those contracts. Thus, appellants' legal theory at trial was, at least in part, based on the doctrine of anticipatory repudiation.

{¶ 50} If appellees were justified in abandoning the contracts, pursuant to the third factor mentioned in *DiGioia,* supra, then the law governing anticipatory repudiation would not apply. As previously stated, the third *DiGioia* factor requires a determination as to whether the contract delays extended such an unreasonable length of time that the aggrieved party was justified in abandoning the contract. *DiGioia Bros. Excavating, Inc.,* supra, 135 Ohio App.3d at 450–451, 734 N.E.2d 438.

{¶ 51} On review we must first determine the time frame within which to judge the reasonableness of appellants' actions in delaying the delivery of the notices to proceed. Logically, we first determine the date the contracts became binding on the parties: September 18, 1997. Although the parties had been

involved in the bidding process from June 1996, there were no binding contracts until all the parties signed them on September 18, 1997.

{¶ 52} The next significant event occurred on October 10, 1997, when appellees sent appellants their first letter demanding a 15 percent increase in the contract price. The entire letter reads as follows:

{¶ 53} "Dear Sirs:

{¶ 54} "Sixteen months have passed since this project was bid. For that reason, we are hereby requesting an increase of 15% on our base bid, if a notice to proceed is not issued by October 31, 1997. With this increase, we can extend our bid until June 30, 1998.

{¶ 55} "If neither a Letter of Understanding by which the county can commit to extending their option by these terms, nor a Notice to Proceed is issued as stated, please withdraw our bid and return our bond with its Power Of Attorney as soon as possible."

{¶ 56} The existence and content of this letter are not in controversy. In this letter, appellees state that they would waive any alleged error or breach caused by the delay in receiving a "notice to commence" if the notice was delivered by October 31, 1997. Appellees also appear to believe that they were not bound by the contracts and that the contracts were still in the bidding stage. The terms and assumptions contained within this letter have no basis in the language of the original contracts. Although the contracts did contain certain provisions for appellees to request adjustments in the contract price, none of those provisions allowed appellees to abandon the contracts. By denying the finality and legitimacy of the contracts, appellees' October 10, 1997 letter constitutes their first step in repudiating the contracts.

{¶ 57} On October 23, 1997, appellees sent appellants another letter, the complete text of which states:

{¶ 58} "Dear Sirs:

{¶ 59} "As per today's conversation with the project architect, Mr. Ray Jaminet, we hereby extend our bid until November 14, 1997—with the understanding an equitable increase will be negotiated at the time the Notice to Proceed is issued.

{¶ 60} "Please understand that there is a home office overhead cost in holding a contract open. Therefore, we cannot hold this contract open indefinitely without the assurance we will be compensated for these costs. We will use an industry standard, such as the 'Eicheley Method' to calculate this cost along with changes in conditions of the work, labor increases and material increases.

{¶ 61}  "If by November 14, 1997, neither a Notice to Proceed nor a Letter of Understanding (accepting the 15% increase) is issued, please withdraw our bid and return our bond with the Power of Attorney."

{¶ 62}  It is clear from this letter that appellees no longer intended to waive their objections to the alleged delay in receiving the notices to proceed.  It is also clear that, if appellants issued the notices to proceed, appellees would interpret that step as an agreement to increase the contract price.  Once again, appellees attempted to impose conditions and terms upon appellants that were not part of the original signed contracts.  If appellants issued a notice to proceed after receiving the October 23, 1997 letter, they risked being liable for appellees' demand for a 15 percent increase in price.  Therefore, appellees' October 23, 1997 letter constitutes the second step in their repudiation of the contracts.

{¶ 63}  There was no evidence at trial revealing any customary time period for issuing a notice to proceed.  This lack of evidence, though, is not particularly germane, because appellees' October 10, 1997 letter issued only one month after the contracts were signed gave appellants a deadline of October 31, 1997, to issue the notices to proceed.  In essence, appellees were defining what they considered to be a reasonable time for appellants to issue the notice to proceed.  Instead of waiting until October 31, 1997, appellees sent a letter on October 23, 1997, linking the notice to proceed with a promise to increase the price of the contract and declaring that they would repudiate the contracts if the notices to proceed and an increase in the price were not received by November 14, 1997.  It was not reasonable for appellees to believe that appellants would issue a notice to proceed after October 23, 1997, without first resolving the issues raised by the October 23, 1997 letter.  Then, in a letter dated December 1, 1997, appellees announced, without conditions, that they were unilaterally revoking their obligations under the contracts: "[P]lease withdraw our bid and return our bond, including the Power of Attorney."  Thus, after December 1, 1997, it would have been a useless gesture for appellants to issue a notice to proceed, as appellees had made their repudiation of the contracts absolute.  Therefore, the third and final step in appellees' repudiation of the contracts occurred on December 1, 1997.  When looking at this time line realistically from the time the parties signed these contracts, it is difficult if not impossible to determine that a delay occurred, much less that such delay could be called unreasonable.

{¶ 64}  Based on appellees' letters, the record reflects that appellants were acting reasonably at all times in withholding the notice to proceed.  Because any delays in issuing a "notice to proceed" that occurred prior to December 1, 1997, were reasonable, the third *DiGioia* exception does not apply and appellees had no legal basis to abandon the contracts.  After December 1, 1997, any failure to

deliver the notices to proceed were unequivocally caused by appellees' repudiation of the contracts on that date.

{¶ 65} Appellees also argue that the "no damages for delay" clauses were not enforceable because they were ambiguous and were drafted by appellants. Appellees contend that contract ambiguities must be construed against the drafter of the ambiguous sections, citing *Graham v. Drydock Coal Co.* (1996), 76 Ohio St.3d 311, 313, 667 N.E.2d 949. Although appellees correctly state a general rule of contract interpretation, their argument fails for two reasons. First, we have not found any material ambiguities in the contracts. Second, this argument is usually reserved to work in favor of unsophisticated parties, with unequal bargaining power, who are bound to the terms of an adhesion contract. *Wall v. Firelands Radiology, Inc.* (1995), 106 Ohio App.3d 313, 327, 666 N.E.2d 235. Appellees are seasoned government contractors:

{¶ 66} "Men who take million-dollar contracts for Government buildings are neither unsophisticated nor careless. Inexperience and inattention are more likely to be found in other parties to such contracts than the contractors, and the presumption is obvious and strong that the men signing such a contract as we have here protected themselves against such delays as are complained of by the higher price exacted for the work." *Wells Bros. Co. v. United States* (1920), 254 U.S. 83, 87, 41 S.Ct. 34, 65 L.Ed. 148.

{¶ 67} Based on the foregoing analysis, we conclude that appellants were protected by the "no damages for delay" provisions in the two contracts and that they are not liable for damages arising from any alleged delay or failure in delivering the notices to proceed.

{¶ 68} There are additional reasons found in the record for sustaining appellants' first assignment of error. Even if appellants were not able to rely on the "no damage for delay" clauses, the trial court erred by failing to enforce the "termination for convenience" clauses of the contracts. Article 18(c) of the contracts states:

{¶ 69} "(c) For Convenience:

{¶ 70} "In addition to the provision of paragraph (a), the County shall have the right to terminate this Agreement without cause upon ten (10) days written notice to the Contractor, but in that event County shall pay to the Contractor a proportionate amount of the Agreement Price, as amended, based upon the percentage of the completion of the work under this Agreement and any amendment thereto, plus cost directly resulting from the termination, subject to County's right to audit Contractor's books and records."

{¶ 71} Appellants argue that "termination for convenience" clauses have been recognized and upheld in Ohio. *Refreshment Serv. Co., Inc. v. Cleveland* (1980), 63

Ohio St.2d 89, 92, 17 O.O.3d 54, 406 N.E.2d 1115; *Jeffrey B. Peterson & Assoc. v. Dayton Metro. Hous. Auth.* (July 21, 2000), 2d Dist. No. 17306, 2000 WL 1006562. Appellants argued at trial and in this appeal that they sent the equivalent of written notices of termination when they returned appellees' bonds on May 11, 1998. The letters accompanying the returned bonds stated, in their entirety:

{¶ 72} "TO WHOM IT MAY CONCERN:

{¶ 73} "Thank you for your recent bid proposal.

{¶ 74} "We are returning your bid/performance bond(s).

{¶ 75} "The Board of Mahoning County Commissioners appreciates your interest in the County's bidding process. We encourage your continued participation."

{¶ 76} Appellees are correct that these letters do not expressly state that the contracts are being terminated. It is clear from the record, though, that appellees had both constructive and actual notice of termination of the contracts by a number of means. The failure to follow the "written notice" provisions of a construction contract can be construed as harmless if there is evidence of constructive or actual notice. *Roger J. Au & Son, Inc. v. Northeast Ohio Regional Sewer Dist.* (1986), 29 Ohio App.3d 284, 292, 29 OBR 349, 504 N.E.2d 1209 (construing a government construction contract); *Brinderson Corp. v. Hampton Rds. Sanitation Dist.* (C.A.4, 1987), 825 F.2d 41, 44; *Seaboard Lumber Co. v. United States* (1999), 45 Fed.Cl. 404, 407. Since appellees themselves declared in their letters of October 10, October 23, and December 1, 1997, that the contracts were terminated, the record certainly demonstrates that appellees knew that the contracts were terminated. Further, the return of appellees' performance bonds provided constructive notice of termination, given appellees' arguments at trial about the importance of these bonds, and given appellees' letters of October 10 and 23, 1997, linking the return of the bonds with the withdrawal of appellees' bids.

{¶ 77} It has also been established that the right to literal compliance with contract provisions may be waived. *Foster Wheeler Enviresponse, Inc. v. Franklin Cty. Convention Facilities Auth.* (1997), 78 Ohio St.3d 353, 360, 678 N.E.2d 519. This waiver may be express or implied. *Griffith v. Linton* (1998), 130 Ohio App.3d 746, 751, 721 N.E.2d 146. Under the doctrine of "waiver by estoppel" or implied waiver, a party to a contract may waive the right to literal compliance with the terms of the contract by engaging in actions or a course of conduct inconsistent with literal compliance. 13 Williston (4th Ed.2000), at 628, Section 39:29. Once again, appellees' three letters declared that they considered the contracts not to be binding and that they terminated these contracts. It is inconsistent for appellees to argue that appellants did not strictly comply with the

notice requirements of the "termination for convenience" clauses of the contracts when appellees themselves sent written notice that the contracts were terminated.

{¶ 78} Finally, as previously stated, a party who breaches a contract through anticipatory repudiation may not demand performance of the contract by the nonrepudiating party. 13 Williston (4th Ed.2000), at 668, Section 39:37. Appellees' anticipatory repudiation alleviated the need for appellants to comply with the literal terms of the "termination for convenience" provisions.

{¶ 79} Appellants rely, in the alternative, on the argument that this court should constructively apply the "termination for convenience" clause ex post facto. Although constructive "termination for convenience" has never been applied in any appellate or Supreme Court opinion in Ohio, appellants do point to federal common-law cases for support. The trial court, in the case now under review, refused to rely on federal common-law cases because the contracts had "choice of law" clauses designating Ohio law as binding. The trial court was incorrect in rejecting federal common law as persuasive authority. The fact that Ohio law is binding in this case does not prohibit a trial court or this court from considering, as persuasive authority, federal common law when Ohio case law is silent on the subject.

{¶ 80} " '[C]onstructive termination for convenience' began as a judicial doctrine that allowed an actual breach by the government to be retroactively justified." *Peterson,* supra, citing *Linan–Faye Constr. Co., Inc. v. Hous. Auth. of Camden* (C.A.3, 1994), 49 F.3d 915, 923. The doctrine arose out of cases dealing with government procurement contracts entered into during World War I. See *College Point Boat Corp. v. United States* (1925), 267 U.S. 12, 45 S.Ct. 199, 69 L.Ed. 490. The *College Point Boat Corp.* case involved a Navy contract for the manufacture of collision mats. After the war was over, the Navy decided that it did not need the mats and tried to negotiate a termination of the contract. The contractor did not want to terminate the contract and eventually sued to enforce the contract. During the litigation, the Navy discovered a statute which would have allowed for termination prior to the manufacturer's filing its complaint. In response, the manufacturer argued that because the Navy never terminated the contract pursuant to the statute, it was irrelevant.

{¶ 81} The United States Supreme Court held:

{¶ 82} "A party to a contract who is sued for its breach may ordinarily defend on the ground that there existed, at the time, a legal excuse for nonperformance by him, although he was then ignorant of the fact. He may, likewise, justify an asserted termination, rescission, or repudiation, of a contract by proving that there was, at the time, an adequate cause, although it did not become known to him until later." Id. at 15–16, 45 S.Ct. 199, 69 L.Ed. 490.

{¶ 83} Based on *College Point Boat Corp.*, the rule has been established in federal courts that "if [a] contract contains a termination for convenience clause and the contracting officer could have invoked the clause instead of terminating, rescinding or repudiating the contract on some other invalid basis, the court will constructively invoke the clause to retroactively justify the government's actions, avoid breach and limit liability." *Best Foam Fabricators, Inc. v. United States* (1997), 38 Fed.Cl. 627, 638. "In the absence of bad faith or clear abuse of discretion, the effect of the constructive termination for convenience is to moot all breach claims and to limit recovery to costs which would have been allowed had the contracting officer actually invoked the clause." *Kalvar Corp. v. United States* (1976), 211 Ct.Cl. 192, 204, 543 F.2d 1298.

{¶ 84} The basic principle to be gleaned from the constructive termination cases is:

{¶ 85} "[O]ne whose government contract is terminated may not recover more than would have been available if the government exercised all of the rights available to it, irrespective of any errors or omissions by the government contracting officer. And this principle makes considerable good sense. There is little reason, after all, why the taxpayers should bear additional economic burdens because a government contract officer misapprehended the legal rights available to the government." *A/S Dampskibssetskabet Torm v. United States* (S.D.N.Y. 1999), 64 F.Supp.2d 298, 313.

{¶ 86} In sustaining appellants' first assignment of error, we do not need to determine whether constructive termination for convenience must be invoked here. Appellees' repudiation of the contracts creates the same effect for all intents and purposes as would result from the doctrine of constructive termination for convenience. We address the issue as an example of the several reasons why appellants were not in breach in the matter before us.

{¶ 87} Although we hold that appellants were not in breach of the contracts, this matter must be remanded to determine whether appellees are entitled to any reimbursement under the terms of the contracts. It is clear that appellees are not entitled to damages for delay, but they may have a claim for reimbursement under the "termination for convenience" provisions of the contracts. The record demonstrates that the contracts were effectively terminated on December 1, 1997. Although appellants did not invoke the "termination for convenience" clauses directly, these contract clauses provided the underlying basis for appellants' defense of the breach-of-contract claims. Therefore, the "termination for convenience" clauses may be enforced up to the point that appellees' own actions caused the contracts to be terminated, which was December 1, 1997. These clauses provide for reimbursement for work already completed and for "cost[s] directly resulting from the termination," if any. It does not

appear that "termination for convenience" costs were ever considered by the trial court, because it held that the "termination for convenience" provisions did not apply. Upon remand, appellees may present evidence of costs prior to the termination itself, including work already accomplished up to and including December 1, 1997. Any damages based on lost bonding capacity, though, cannot be included in a determination of costs as more fully discussed below.

{¶ 88} Given our reasoning as stated above, assignments of error numbers three, four, and six are rendered moot.

{¶ 89} Appellants' fifth assignment of error asserts:

{¶ 90} "The trial court abused its discretion in finding that appellee, Terreri Construction Company, Inc. presented sufficient evidence of lost future profit damages based on lost bonding capacity."

{¶ 91} While we have ruled in favor of appellants on the breach of contract claims stemming from their delay in issuing notices to proceed and the lack of an express written notice of termination under the "termination for convenience" clauses, appellees' claim for damages based on lost or impaired bonding capacity presents a separate and distinct claim. This claim was founded on appellees' allegations that appellants were in breach of miscellaneous contract provisions or, alternatively, as a reimbursement under the "termination for convenience" clauses. Appellants argue that a plaintiff must prove damages of lost or impaired bonding capacity by establishing with reasonable certainty that specific job opportunities were lost and that a net profit would have been made on those specific job opportunities which were lost, citing *Royal Elec. Constr. Corp. v. Ohio State Univ.* (Dec. 21, 1993), 10th Dist. Nos. 93AP–399 and 93AP–424, 1993 WL 532013, reversed on other grounds (1995), 73 Ohio St.3d 110, 652 N.E.2d 687. Appellees assert in rebuttal that they proved that they generally made 15 percent profit on their contracts and that they obtained $2,400,000 in government contracts immediately after their bonds were returned. Appellees contend that this proof was sufficient to sustain the trial court's award of damages on this issue.

{¶ 92} Appellants overstate the holding of *Royal Elec. Constr. Corp.* In that case, the Tenth District Court of Appeals upheld a trial court decision denying an award for lost profits premised on a claim of lost bonding capacity. The appellate court upheld the decision both because (1) the plaintiff was unable to demonstrate that it had lost specific jobs due to reduced bonding capacity and (2) the plaintiff's evidence did not show ·that the parties contemplated lost bonding capacity damages as being part of the contracts at issue. Id. *Royal Elec. Constr. Corp.* did not hold that lost profit damages could be proved *only* by evidence of specific contracts lost due to impaired bonding capacity.

{¶ 93} That said, while there are no Ohio cases denying lost-profit damages due to impaired bonding capacity specifically because the contractor lacked proof of specific lost contracts, the general rules governing lost-profit damages support appellants' position. A party claiming lost profits due to impaired bonding capacity must prove the existence and the amount of damages with reasonable certainty; they may not be speculative. *Gahanna v. Eastgate Properties, Inc.* (1988), 36 Ohio St.3d 65, 521 N.E.2d 814, syllabus. The proof or lack of proof of specific lost contracts due to the impairment of bonding capacity is one factor that should be considered in determining lost-profit damages because of the contractor's impaired bonding capacity.

{¶ 94} "There must be more than a conclusory statement as to the amount of lost profits. An explanation of how that sum was determined is required. Lost profits must be substantiated by calculations based on facts available or in evidence, otherwise they are speculative and uncertain." (Citations omitted.) *Rhodes v. Rhodes Indus., Inc.* (1991), 71 Ohio App.3d 797, 809, 595 N.E.2d 441.

{¶ 95} The type of loss at issue must also have been contemplated by the parties at the time the contract was entered into and must have been reasonably foreseeable. *Charles R. Combs Trucking, Inc. v. Internatl. Harvester Co.* (1984), 12 Ohio St.3d 241, 244, 12 OBR 322, 466 N.E.2d 883; see, also, *Royal Elec. Const. Corp.*, supra; *Great Oaks Co. v. Cincinnati Ins. Co.* (Mar. 29, 1984), 10th Dist. No. 83AP–42, 1984 WL 7636; *Rocky Mountain Constr. Co. v. United States* (1978), 218 Ct.Cl. 665, 666, 1978 WL 8468; *Rush Presbyterian St. Luke's Med. Ctr. v. Safeco Ins. Co. of Am.* (N.D.Ill.1989), 722 F.Supp. 485, 494. In these cases, the most common reason for denying a claim for lost bonding capacity damages is lack of proof that the parties ever contemplated that the defendant would be liable for these types of losses.

{¶ 96} Courts also deny damages for lost bonding capacity because "[r]eceipt or non-receipt of future contracts is both speculative in nature and dependent on many factors not related to bonding [capacity]." *Olin Jones Sand Co. v. United States* (1980), 225 Ct.Cl. 741, 744, 1980 WL 13211.

{¶ 97} In some cases a party claiming lost-profit damages for impaired bonding capacity may be required to prove the accuracy of the bidding process and that it had experience in profitably completing the types of contracts supposedly lost. *S.C. Anderson, Inc. v. Bank of Am.* (1994), 24 Cal.App.4th 529, 536–537, 30 Cal.Rptr.2d 286.

{¶ 98} The record before us reveals a complete lack of evidence that the parties ever contemplated the effects of lost bonding capacity when they entered into their contracts. Certainly, there is nothing in the contracts themselves

discussing damages for impaired bonding capacity or setting a time for return of the bonds. There was specific evidence by appellees' insurance agent that no party receiving bids from appellees received information about their bonding capacity. If appellants never knew the extent of appellees' bonding capacity, it is difficult to understand how they could have understood the specific effects of this contract as to the loss or impairment of that capacity.

{¶ 99} There was also no evidence presented that appellees attempted to procure any specific contracts during the period they claim to have incurred lost bonding damages. There was no evidence that any specific contracts were lost because of inadequate bonding capacity. Appellees did not even allege, much less prove, what types of contracts they may have lost. The record contains only a broad, general allegation of lost contracts. Needless to say, appellees also did not produce evidence as to their ability to profitably complete the type of contracts they allegedly lost.

{¶ 100} Appellees' expert witness, Mr. Gett, testified that he did not consider any specific contract and in fact never saw any specific contract, in coming to his conclusions about appellees' lost profit damages.

{¶ 1} Mr. Terreri testified that "[t]here were a hundred jobs out there that I passed on that I could have bid." He never attempted to specify what jobs he passed up or was rejected for because of bonding problems.

{¶ 102} Even more surprising is the lack of any evidence that appellees actually used the bonding capacity remaining available to them (which, according to appellees, was about $800,000) during the period they are claiming loss-of-bonding damages. Appellees submitted a trial exhibit listing 42 bidding opportunities from September 18, 1997, until March 3, 1998. Of this list, 30 of the opportunities were for projects valued at less than $800,000. If appellees were unable to procure any of these 30 contracts, it could not have been due to a lack of bonding capacity. Therefore, without evidence showing that appellees actually used their remaining bonding capacity, or some credible and substantiated theory why it was not used, it is reasonable to conclude that factors other than lack of bonding capacity prevented appellees from successfully bidding on at least those 30 projects.

{¶ 103} Based on the foregoing considerations, appellees' award for damages arising out of lost bonding capacity must be reversed as being unsupported by the evidence. Although appellees' lack of evidence of specific lost contracts does not, standing alone, defeat their claim for lost bonding damages, the complete lack of any real evidence of lost opportunities and evidence which ties these lost opportunities to the lost bonding capacity, or that lost bonding damages were contemplated by the parties at all, leads us to conclude that appellees have not met their burden of proof. Appellants' fifth assignment of error is sustained. On

remand the issue of lost or impaired bonding capacity may not be considered in any award of lost damages, costs, or expenses to appellees.

{¶ 104} Based on all of the foregoing, appellees' cross-appeal wherein they argue that they should be entitled to prejudgment interest is moot.

{¶ 105} In conclusion, we sustain appellants' first assignment of error and reverse the trial court's judgment with respect to the breach of contract claims arising out of the second and third counts of appellees' complaint. We reverse the award of lost profit damages of $237,000 arising from count two and enter judgment in favor of appellants. We reverse the award of lost profit damages of $115,600 arising from count three and enter judgment in favor of appellants. We also sustain appellants' fifth assignment of error and reverse the trial court judgment with respect to appellees' claim for damages arising out of lost or impaired bonding capacity. We reverse the award of lost-profit damages of $118,500 arising from count four of the complaint and enter judgment in favor of appellants. We further remand this case to the trial court for a determination of appellees' costs, if any, directly relating to and arising prior to the termination of the contracts on December 1, 1997, pursuant to the "termination for convenience" provisions of the contracts; however, the trial court shall not award appellees any costs or damages relating to lost or impaired bonding capacity in this remand. Appellants' second, third, fourth, and sixth assignments of error and appellees' cross-assignment of error are rendered moot.

Judgment accordingly.

VUKOVICH and DEGENARO, JJ., concur.