**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
**File Name: 11a0509n.06**

**Case No. 09-4235**

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

**FILED**

*Jul 22, 2011*

LEONARD GREEN, Clerk

| | |
|---|---|
| D&S MACHINE PRODUCTS, INC., | ) |
| | ) |
| Plaintiff-Appellant, | ) ON APPEAL FROM THE |
| | ) UNITED STATES DISTRICT |
| v. | ) COURT FOR THE |
| | ) SOUTHERN DISTRICT OF |
| THYSSENKRUPP BILSTEIN OF | ) OHIO |
| AMERICA, INC., | ) |
| | ) |
| Defendant-Appellee. | ) |
| _____ | ) |

**BEFORE: BATCHELDER, Chief Judge; MARTIN and SUTTON, Circuit Judges.**

**ALICE M. BATCHELDER, Chief Judge.** Plaintiff D&S Machine Products appeals

an award of summary judgment in favor of defendant ThyssenKrupp Bilstein. We AFFIRM

in part, REVERSE in part, and REMAND for further proceedings consistent with this opinion.

**I.**

ThyssenKrupp Bilstein ("Bilstein") provides parts for Mercedes Benz automobiles,

among others. Bilstein purchased certain component parts from D&S Machine Products: M-

class parts and non-M-class parts (the "M-class" referring to Mercedes M-class automobiles).

For the non-M-class parts, Bilstein issued a purchase order to D&S, which serves as the fully

integrated contract — this is not in dispute. For the M-class parts, there is some dispute as to

what constitutes the actual contract. Ultimately, however, this dispute does not affect the resolution of this appeal.[1]

D&S sued Bilstein in diversity in federal court in Ohio, claiming: (1) breach of contract for the M-class parts; (2) breach of contract for the non-M-class parts; and (3) fraud in the inducement (i.e., by contracting for the M-class parts, Bilstein had allegedly induced D&S to purchase an expensive piece of machinery). Bilstein moved for summary judgment on all three claims. The district court granted summary judgment to Bilstein on the fraud-in-the-inducement claim on the basis that it was indistinguishable from the breach-of-contract claim, and D&S did not appeal that decision. The district court originally denied summary judgment on the breach-of-contract claims, but later reconsidered and granted Bilstein summary judgment on all claims. D&S appealed.

## II.

Because this is an appeal of a grant of summary judgment, we conduct a *de novo* review, *Walton v. Ford Motor Co.*, 424 F.3d 481, 485 (6th Cir. 2005), and draw all reasonable inferences in favor of D&S, the non-moving party, *see Anderson v. Liberty Lobby, Inc.*, 477

---

[1] The district court found that certain writings between the parties — i.e., the July 2005 purchase orders (replaced by the October 2005 purchase orders, which D&S denies receiving), the January 2006 invoices, and the February 2006 e-mail — established all the essential terms of the agreement and served as a written contract.

D&S protests that finding and contends that the contract actually at issue is the oral contract that preceded any of the writings. For purposes of resolving this appeal, we will accept — without deciding — D&S's contention and begin our analysis with D&S's description of the oral contract. Consequently, the dispute as to what constitutes the actual contract (and the district court's resolution thereof) does not affect the analysis or ultimate decision herein.

U.S. 242, 255 (1986). And accepting D&S's version of the facts *in toto*, we must conclude

that Bilstein is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c).[2]

According to D&S, beginning in the spring to early summer of 2005, these two parties

had an *oral* contract for the M-class parts.[3] D&S describes the contract this way:

> **Subject matter**: D&S would produce the M-Class parts initially using slower and less cost-effective CNC machines, and then, on a faster and more efficient Hydromat machine.
>
> **Price**: Bilstein would temporarily pay D&S higher per-part rates while D&S produced the M-Class parts on CNC machines [i.e., the 'CNC prices'], but pricing would drop to 'production prices' [i.e., the 'Hydromat prices'] after production was transitioned to the Hydromat [machine].
>
> **Start date**: D&S would start producing parts immediately.
>
> **Quantity**: D&S had a contract for the life of the part or alternatively for at least five years.
>
> **Equipment**: D&S agreed to purchase a Hydromat machine in exchange for the promise of Bilstein using D&S for five years or life of the program.

Appellant's Brief, p. 33 (record citations omitted). D&S began to produce the parts using the

CNC machines and Bilstein paid for those parts at the CNC prices. D&S also purchased the

Hydromat machine, as promised, and by January 2006 was producing the parts using the

Hydromat machine and charging Bilstein the lower Hydromat prices. On February 9, 2006,

---

[2]The Supreme Court, through congressional authorization, *see* 28 U.S.C. § 2072, revised Federal Rule of Civil Procedure 56 ("Summary Judgment"), effective December 1, 2010. Because Bilstein filed its motion for summary judgment prior to December 1, 2010, the version of Rule 56 that was in effect at that time governs this appeal.

[3]We accept for present purposes that this was an oral "contract" (as described by D&S) and ignore any suspicion that this was actually just negotiations between merchants pending a written purchase order. We will also ignore the statute-of-frauds and parol-evidence issues that would otherwise warrant more thorough analyses. *See also* fn. 1, *supra*.

D&S sent Bilstein an email confirming the new prices. This practice lasted for approximately six weeks.

On March 23, 2006, "Bilstein presented D&S with an ultimatum — produce the M-Class parts at [even lower] prices[, specifically prices] that D&S had rejected on two previous occasions, or Bilstein would resource the parts to a European supplier." Appellant's Reply Brief, p. 4. D&S rejected this ultimatum and, on April 20, 2006, wrote to Bilstein: "Due to th[is] threat . . . , D&S will stop producing the [M-class parts] as of April 21, 2006 and discontinue shipment of these products until this matter is resolved and Bilstein agrees to uphold the original agreement."[4]

But D&S did not discontinue shipment of these M-class parts; D&S continued to ship the parts but invoiced Bilstein at the former, higher CNC prices. Bilstein paid the invoices at the Hydromat prices. On June 30, 2006, D&S sent an email to Bilstein asserting that Bilstein's failure to pay the CNC prices rendered it in breach of contract and warned that it would not ship any more parts unless Bilstein paid the difference in full by July 7, 2006. Bilstein did not pay the difference and D&S did not ship any more parts. Bilstein asked D&S to retract its repudiation and when D&S did not respond, Bilstein said it considered the agreement terminated.

---

[4] Had D&S actually "discontinued shipment," the outcome of this appeal would have been markedly different. With this letter, D&S put Bilstein on notice that it considered Bilstein's ultimatum a repudiation of the agreement and expressly warned Bilstein that it would exercise its right to treat that repudiation as a breach by discontinuing shipment.

It is also noteworthy that Bilstein sent a reply letter the following day, April 21, 2006, disputing certain claims in D&S's letter but stating in pertinent part: "If Bilstein made a commitment to D & S, it will honor that commitment."

On October 23, 2006, Bilstein wrote to D&S canceling the non-M-class contracts because "Bilstein can no longer reasonably rely on D&S as a supplier." D&S filed suit on October 26, 2006, claiming that Bilstein breached the M-class parts contract by failing to pay the CNC prices and by obtaining another supplier when D&S refused to ship parts at the Hydromat prices. D&S later added a claim that Bilstein also breached the non-M-class parts contract by terminating it in bad faith (i.e., in retaliation for D&S's refusal to capitulate to its request for lower M-class part prices).

In granting summary judgment to Bilstein, the district court concluded that D&S was at fault for breaching the contract "when it unilaterally raised the price of the parts and then stopped shipment on June 30, 2006." The court reasoned:

> The problem with D&S's actions was that *even if the agreement between the parties was for the life of the part* [as D&S contends], there was no basis for D&S to revert to the higher, CNC prices for the parts. The evidence in the record — both the documents and the oral testimony — reveal[s] that the parties agreed that the CNC pricing was temporary and that the prices would be lowered once the Hydromat was tooled. Thus, even if Bilstein had [improperly] terminated the contract in the spring of 2006 (which it did not) and if such a termination had entitled D&S to a remedy, that remedy would have involved damages based on the 'current manufacturing' [i.e.,] lower Hydromat price, not the temporary CNC price.

On appeal, D&S does not address this reasoning or even attempt to explain or justify its insistence on the CNC prices. In fact, in its reply brief, D&S specifically disclaimed any reliance on the CNC pricing (though without addressing the foregoing), asserting:

> 6. *D&S does not claim on appeal that it is entitled to enforce the CNC prices for the duration of the life of the part.*
>
> Bilstein argues that even if the parties agreed to a long-term, life-of-the-part agreement for the M-Class parts, D&S is only entitled to

> recover damages based on the lower Hydromat pricing. (Bilstein's Br. 28.)
> D&S does not argue otherwise on appeal. (See generally D&S's Appeal Br.)

Appellant's Reply Brief, p. 17 (italicized heading in the original). Therefore, D&S has left the

district court's actual analysis and reasoning unchallenged on appeal.

Instead, D&S contends that, by concluding that D&S breached the contract, the district

court erred because Bilstein had already breached (i.e., anticipatorily repudiated) the contract

when it issued the lower-price-or-we're-going-to-Europe ultimatum at the March 23, 2006

meeting.

Under the Ohio statute on anticipatory repudiation, Ohio Rev. Code § 1302.68(B), if

a buyer "repudiates the contract with respect to a performance not yet due," the aggrieved

seller may resort to any of the seller's remedies, including withholding delivery of the goods,

*see* § 1302.77(A).

> It is not necessary for repudiation that performance be made literally and
> utterly impossible. *Repudiation can result from action which reasonably
> indicates a rejection of the continuing obligation. . . .* Under the language of
> this section, a demand by one or both parties for more than the contract calls
> for in the way of counter-performance is not in itself a repudiation nor does it
> invalidate a plain expression of desire for future performance. *However, when
> under a fair reading it amounts to a statement of intention not to perform
> except on conditions which go beyond the contract, it becomes a repudiation.*

Ohio Rev. Code § 1302.68, Official Comment 2 (emphasis added). D&S insists that Bilstein's

"ultimatum" (to "produce the M-Class parts at prices that D&S had rejected on two previous

occasions, or [else] Bilstein would resource the parts to a European supplier," Appellant's

Reply Brief, p. 4.) was a "*statement of intention not to perform except on conditions which go*

*beyond the contract*," and therefore an anticipatory repudiation of the contract that justified its actions.

But the problem with D&S's theory is that "[s]uch a repudiation ripens into a breach prior to the time for performance only if the promisee 'elects to treat it as such.'" *Franconia Assocs. v. United States*, 536 U.S. 129, 143 (2002) (quoting *Roehm v. Horst*, 178 U.S. 1, 13 (1900)); *accord Gilmore v. Am. Gas Mach. Co.*, 129 N.E.2d 93, 95 (Ohio Com. Pl. 1952) ("To make a renunciation as a breach, the other party must treat it as a breach and act upon it." (citation and quotation marks omitted)); *see also Homeland Training Ctr., LLC v. Summit Point Auto. Research Ctr.*, 594 F.3d 285, 292 (4th Cir. 2010). But here, even after the ultimatum (i.e., the alleged anticipatory repudiation), D&S continued to deliver M-class parts and submit invoices to Bilstein for them, which Bilstein paid (albeit at the contracted-for Hydromat prices rather than the CNC prices that D&S was then demanding).[5] Because D&S

---

[5]The dissent proposes that D&S's act of unilaterally raising the price sufficed to treat the repudiation as a breach because this act was clearly inconsistent with the terms of the contract. We see two flaws in this proposition.

In the letter that D&S sent to Bilstein on April 20, 2006, alerting Bilstein that it considered Bilstein's ultimatum a repudiation of the agreement, D&S stated unequivocally that it would "*discontinue shipment*" of the parts until the matter was resolved (i.e., until "Bilstein agree[d] to uphold the original agreement"). D&S did not state, suggest, or even imply that it might take some other type of action (e.g., unilaterally raise the price) as a means of exercising its right to treat that repudiation as a breach. Therefore, D&S's act of unilaterally raising the price did not alert Bilstein that it was exercising its right to treat the repudiation as a breach. Rather, from Bilstein's perspective, D&S merely breached the contract without explanation. We cannot agree — at least under the facts of this case — that it was enough that D&S's actions were inconsistent with the contract terms in a way that was different from the warning and unpredicted by the warning letter. To act on the repudiation in this case, and convert it into a breach, D&S was obliged to follow through on the particular action that it had forewarned in the April 20 letter (i.e., to discontinue shipment).

Moreover, as a matter of Ohio law, it is not enough that D&S's actions were merely inconsistent with the contract terms. Under Ohio Revised Code § 1302.68(B), if a buyer "repudiates the contract with respect to a performance not yet due," the seller may resort to any of the "seller's remedies" listed in § 1302.77. Unilaterally raising the price is not included among those remedies; nor is there anything remotely similar. If we were to allow the seller to resort to any remedy of its own design (or, as the dissent proposes, any action inconsistent with the terms of the contract), we would be re-writing § 1302.68(B) to exclude its express limitation to "seller's remedies" listed in § 1302.77.

did not treat the repudiation as a breach, it did not ripen into one. *See Franconia*, 536 U.S. at 143.

The district court was correct to conclude that D&S cannot recover because D&S was the party that originally breached the contract and D&S has not overcome that conclusion on appeal. Furthermore, because D&S was at fault for breaching the M-class parts contract, Bilstein was justified in believing D&S to be unreliable and therefore terminating the non-M-class parts contract. *See* Ohio Rev. Code § 1302.67, Official Comment No. 3 ("Under commercial standards and in accord with commercial practice, a ground for insecurity need not arise from or be directly related to the contract in question. . . . Thus a buyer who falls behind in 'his account' with the seller, even though the items involved have to do with separate and legally distinct contracts, impairs the seller's expectation of due performance." (paragraph break omitted)).

### III.

For the non-M-class parts, the district court also held that "D&S is entitled under the general terms and conditions to its outstanding receivables on product received and accepted by Bilstein." R. 55 at 18. D&S argues that the court erred by limiting this award to outstanding receivables because, under the terms of the contract for the non-M-class parts, Bilstein was also required to pay the "reasonable direct out-of-pocket damages incurred by [D&S] in connection with Products covered by this Purchase Order and not shipped prior to cancellation or change and a reasonable profit based on such costs." R. 32-21 at ¶15(b). Bilstein does not respond to this claim on appeal, and we note that in its October 23, 2006,

termination letter, Bilstein essentially sided with D&S on this point. *See* R.32-51 at 3 (agreeing to pay D&S all "reasonable direct out-of-pocket damages" including a "reasonable profit" for "all [non-M-class] parts manufactured . . . but not shipped").

We reverse the district court's holding limiting D&S's recovery to outstanding receivables and direct Bilstein to compensate D&S for the unshipped non-M-class parts in an amount consistent with the terms of its agreement and Ohio Revised Code § 1302.77.

## IV.

Because we find that Bilstein is entitled to judgment as a matter of law, we **AFFIRM** the judgment of the district court in part, but because the parties' agreement provides for a remedy different from that provided by the district court, we **REVERSE** that part of the decision and **REMAND** for further proceedings consistent with this opinion.

BOYCE F. MARTIN, JR., Circuit Judge, concurring in part and dissenting in part. As the district court initially observed, there is a disputed issue of fact at nearly every juncture of this complex, commercial transaction. I join part III of the majority opinion, discussing the contract for the non-M-class parts. However, I dissent from the majority's analysis of the contract for M-class parts because I believe it incorrectly imposes additional requirements on what a party to a contract must do in order to elect to treat the other party's anticipatory repudiation as a breach of the agreement. At the very least, the majority's interpretation is not supported by Ohio law.

Although this transaction involved two sophisticated parties, it was memorialized in a very unsophisticated manner. Due to the lack of complete writings, it is an understatement to say that this case presents disputed issues of fact. Don't take my word for it: look at the majority opinion, which cannot even make it through the first page without stopping to acknowledge that there is a question of fact as to what the terms of the agreement between the parties are. This, mind you, in a breach of contract action. We can discern, however, that the agreement called for D&S to make and supply parts for Bilstein. How many parts and for how long a time period we cannot say for certain. While the majority's theory renders these disputed issues immaterial, viewing the facts in a light most favorable to D&S, the non-moving party, I do not see any theory on which summary judgment could be granted in favor of Bilstein. Therefore, I would reverse the grant of summary judgment.

The majority explains that these questions of fact are immaterial because even accepting Bilstein's request for a price reduction as a repudiation, which we must when

considering the facts in a light most favorable to D&S as the non-moving party, D&S did not elect to treat it as a breach. However, I believe that D&S took sufficient actions inconsistent with the agreement between the parties to show that it treated Bilstein's repudiation as a breach.

Ohio follows the rule that "[a] repudiation of a contract before the time for performance gives the adverse party the option to treat the entire contract as broken and to sue for breach of contract, and there is no necessity in such case for a tender of performance or compliance with conditions precedent, or to wait for the time for performance to arrive." *Wren Reese, Inc. v. Structural Concrete Prods., Inc.*, 362 N.E.2d 269, 273 (Ohio Ct. App. 1975); *see also Se. Land Dev. Ltd. v. Primrose Mgmt. L.L.C.*, 2011-Ohio-2341, 2011 WL 1944307, at ¶ 11 (Ohio Ct. App. May 16, 2011); *Farmers Comm'n Co. v. Burks*, 719 N.E.2d 980, 990 (Ohio Ct. App. 1998). As the majority points out, in addition to suing for breach of contract, if the non-breaching party is a seller of goods, it may also resort to any of the seller's ordinary remedies. Ohio Rev. Code §§ 1302.68, 1302.77. Consistent with these remedies, and particularly relevant in this case, Ohio law recognizes that the non-breaching party may rely on the other's anticipatory repudiation as a defense against a subsequent claim for breach of contract. *Daniel E. Terreri & Sons, Inc. v. Mahoning Cnty. Bd. of Comm'rs*, 2003-Ohio-1227, 786 N.E.2d 921, at ¶ 44 (Ohio Ct. App. 2003).

While Ohio affords the non-breaching party a wide array of remedies, none, understandably, allow the non-breaching party to demand payment in excess of the contract price as D&S did. Here, after Bilstein's alleged repudiation, D&S continued to ship parts but

reverted to billing for them at the substantially higher, CNC prices it initially charged when it first began production. While there is some uncertainty about many of the contract terms, there is no question that the contract obligated D&S to charge the lower, Hydromat prices. D&S's decision to charge more is neither consistent with the contract nor a permissible seller's remedy in Ohio. However, although D&S had no right to receive this demand, it does show that D&S elected to treat Bilstein's repudiation as a breach.

The majority appears to correctly observe that Ohio follows the rule in most other jurisdictions that "a repudiation ripens into a breach prior to the time for performance only if the promisee elects to treat it as such." *Franconia Assocs. v. United States*, 536 U.S. 129, 143 (2002) (internal quotation marks and citation omitted); *see Se. Land Dev.*, 2011-Ohio-2341, 2011 WL 1944307, at ¶ 11; *Gilmore v. Am. Gas Mach. Co.*, 129 N.E.2d 93, 95 (Ohio Com. Pl. 1952). However, the majority, in my view incorrectly, places additional requirements on what a party must do to acknowledge that it is treating an anticipatory repudiation as a breach.

Without identifying any authority in Ohio law, the majority states that because D&S continued to ship products and submit invoices, albeit at prices above the contract price, it did not treat the repudiation as a breach.[1] However, in reaching this conclusion I believe that the majority overlooks the importance of D&S's decision to bill at higher prices after Bilstein's repudiation.

---

[1] As explained above, the majority correctly notes that D&S's decision to raise the price is not a permissible seller's remedy in Ohio. However, the dispositive issue at this stage is whether D&S elected to treat Bilstein's repudiation as a breach, not whether its demands were a permissible seller's remedy. While section 1302.77 sets forth a seller's exclusive remedies in this type of situation, it says nothing to how an aggrieved seller may establish that it has elected to treat a repudiation as a breach.

The question of whether a party treated a repudiation as a breach is ordinarily a question of fact and is not often discussed in detail in written opinions. The limited authority on this issue, however, confirms that a party need not do much to establish that it has elected to treat a repudiation as a breach. *See Bu-Vi-Bar Petroleum Corp. v. Krow*, 40 F.2d 488, 493 (10th Cir. 1930) (explaining that the injured party need not bring suit to treat a repudiation as a breach and that "[a] change of position . . . manifesting such election is sufficient, and notice of election to treat the repudiation as a breach is not necessary"); *Wren Reese*, 362 N.E.2d at 270-71, 273 (holding that contractor treated seller's repudiation as a breach where it found a different supplier in response to demands for a price increase). In contrast, if a party continues to perform under the contract or seeks specific performance of the contract, courts have generally found that it failed to treat a repudiation as a breach. *See, e.g,*, *ESPN, Inc. v. Office of Comm'r of Baseball*, 76 F. Supp. 2d 383, 388 (S.D.N.Y. 1999) (finding that party did not accept the breach where it continued to perform pursuant to the contract terms for one year after the breach); *Profile Invs. No. 25, LLC v. Ammons E. Corp.*, 700 S.E.2d 232, 238 (N.C. App. 2010) (holding that the non-repudiating party did not accept the repudiation when it sent letters demanding that the repudiating party proceed with the contract and filed a complaint seeking specific performance); *but see also* Restatement (Second) of Contracts § 57 ("The injured party does not change the effect of a repudiation by urging the repudiator to perform in spite of his repudiation or to retract his repudiation.").

The purpose of requiring that the non-breaching party treat the repudiation as a breach before it ripens into one is to prevent strategic behavior. The non-repudiating party cannot

13

hold the other's repudiation as a trump card ready to play at its convenience if it becomes beneficial to do so at some future point. However, that is not what we have in this case. Because D&S had no basis to charge Bilstein higher prices, doing so was not consistent with any interpretation of the contract. It was, perhaps, a proposal for a new contract. If D&S had resorted to a permissible seller's remedy, such as failing to ship product, that unquestionably would have been sufficient to show that it treated Bilstein's repudiation as a breach.[2] Charging an exorbitant price is no different than halting shipments when determining if a party treated a repudiation as a breach.[3] This is because both are inconsistent with the terms of the repudiated contract. In fact, on this point the majority agrees—the majority acknowledges that billing above the contract price was inconsistent with the agreement. But, because D&S took these actions in response to Bilstein's anticipatory repudiation, I would hold that it raises a material question of fact as to whether D&S elected to treat the repudiation as a breach.

In my view, a party can elect to treat a repudiation as a breach by taking actions inconsistent with the terms of the contract. Those actions need not be the statutorily available remedies and need only be enough to show that it is not continuing to perform under the agreement. In this case, by attempting to charge Bilstein more than the contract price, D&S, at minimum, raised a material question of fact as to whether it elected to treat Bilstein's

---

[2]The majority also states that D&S had to stop shipping products in order to treat Bilstein's repudiation as a breach because that was the action it initially said that it would take when Bilstein repudiated. However, the majority identifies nothing in Ohio law, or the law of any other state, that imposes such a requirement. Because I do not believe that such a requirement exists, or would be wise, D&S's decision to change its course of action is immaterial.

[3]D&S's decision, I can only assume, arose out of the unique factual situation in this case where Bilstein allegedly repudiated the contract even though it needed the parts and D&S suspected that Bilstein had no other supplier.

repudiation as a breach. Therefore, I would reverse the grant of summary judgment and remand the matter to the district court for a factfinder to resolve the many questions of fact that surround this transaction.